

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-7-2005

# Shuman v. Penn Manor Sch Dist

Precedential or Non-Precedential: Precedential

Docket No. 04-2715

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Shuman v. Penn Manor Sch Dist" (2005). *2005 Decisions.* Paper 490.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/490

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-2715

———

JOSHUA SHUMAN, A MINOR
BY AND THROUGH HIS MOTHER AND
NATURAL GUARDIAN, TERESA SHERTZER;
TERESA SHERTZER,

Appellants

v.

PENN MANOR SCHOOL DISTRICT;
PENN MANOR SCHOOL BOARD;
DONALD STEWART, INDIVIDUALLY;
JANICE M. MINDISH, INDIVIDUALLY
BRIAN D. BADDICK, INDIVIDUALLY;
PHILIP B. GALE, INDIVIDUALLY;
CAROLE FAY, INDIVIDUALLY,

(Amended See Clerk's Order of 8/11/04)

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 02-cv-03594)
District Judge:  Honorable James K. Gardner

———

Argued June 29, 2005
Before:  NYGAARD[*], SMITH, and FISHER, *Circuit Judges*.

(Filed September 7, 2005)

Deirdre A. Agnew (Argued)
Building 400A
1450 East Boot Road
West Chester, PA  19380
        *Attorney for Appellants*

Ellis H. Katz (Argued)
Sweet, Stevens, Tucker & Katz
331 Butler Avenue
P.O. Box 5069
New Britain, PA  18901
        *Attorneys for Appellees*

Jason R. Wiley
School District of Philadelphia
Office of General Counsel
440 North Broad Street, 3rd Floor
Philadelphia, PA  19130-4015
        *Attorney for Appellees,*
        *Penn Manor School Board,*
        *Donald Stewart and*
        *Janice M. Mindish*

---

[*]The Honorable Richard L. Nygaard assumed senior status on July 9, 2005.

OPINION OF THE COURT

FISHER, *Circuit Judge*.

This is an appeal from the District Court's grant of summary judgment in favor of defendants Penn Manor School District, Penn Manor School Board, and several administrators of Penn Manor High School and against plaintiff Joshua Shuman ("Shuman"), a student at the Penn Manor High School. Shuman alleges that the defendants violated his due process rights under the Fourth and Fourteenth Amendments and his right to equal protection under the Fourteenth Amendment during the course of an investigation into an incident of sexual misconduct between Shuman and a female classmate. We find no violation of Shuman's constitutional rights and will affirm the judgment of the District Court.

## I. FACTS

On December 7, 2001, an incident of sexual misconduct took place between Shuman and Olivia Becker ("Becker"), a female student at the Penn Manor High School, during their agricultural science class. The nature of the sexual misconduct – whether consensual or not – is firmly disputed by both students; however, because the details of the underlying incident are not relevant for our purposes, we turn to the school's investigation of the incident, which is said by Shuman to have deprived him of his Fourth and Fourteenth Amendment rights.

3

On December 10, 2001, Becker spoke with Assistant Principal Phillip B. Gale ("Gale") and relayed her version of events, reporting that Shuman had touched her in a sexual manner without her consent three days earlier. Gale then called Shuman to his office at approximately 10:15 a.m. where he was questioned for ten to fifteen minutes regarding the incident. Shuman denied forcibly touching Becker and instead claimed that the incident was consensual. Shuman also named students sitting in close proximity to Shuman and Becker during their class as potential witnesses. When asked to describe the conversation between himself and Gale, Shuman testified in his deposition:

> He asked me if I knew why I was there and asked --- he had asked about a situation that had occurred on the 7th. And I said what situation and he said the one concerning you and Olivia Becker. And I said, yeah, I know that there was something there but I didn't figure it was a situation there. And he said that she was claiming that I physically forced my hand upon her, and that she was very upset about it. And then I told him what I just went through and told you during the whole story and he said the stories weren't matching and asked me if I knew about what she was talking about. I said I had no idea and he said, well, I'd have to wait there while he called some witnesses down, to see if he could find a witness.

A. 161-62 (Dep. Shuman).

Following this meeting, Gale instructed Shuman to sit in a small conference room across the hallway from Gale's office. Shuman stayed in the conference room and did schoolwork for the next several hours. During that time, Gale claims that he re-

4

interviewed Becker, informing her that Shuman had denied her version of the events and characterized the incident between them as consensual. According to Gale, Becker adamantly denied that the incident was consensual and encouraged Gale to speak with three friends with whom she confided after the incident. Gale claims he interviewed these students after his second meeting with Becker. Shuman disputes that Gale spoke with Becker a second time or that he spoke to these additional witnesses at all.[1]

At approximately 11:30 a.m., Gale escorted Shuman to the cafeteria, where Shuman ate alone and apart from Gale and the other faculty members. After lunch, Gale escorted Shuman back to the conference room where Shuman stayed for the remainder of the day. Shuman left the room only one other time, before lunch, to get a drink of water.

Gale later returned to the conference room with Assistant Principal Brian D. Baddick ("Baddick"). Together, Gale and Baddick questioned Shuman again about the incident with Becker. This meeting lasted about ten minutes. Gale returned to the conference room again around 1:15 p.m. and informed Shuman that he was going to be suspended as punishment for the "inappropriate conduct." A. 177 (Dep. Shuman).

Sometime after 1:00 p.m., Gale telephoned Shuman's mother, Teresa Shertzer ("Shertzer"), and informed her of the incident involving Shuman and of the resulting four-day suspension. Gale

---

[1]Because we do not find this dispute to be material for purposes of summary judgment, we accept Shuman's account that Gale spoke to Becker only one time and did not interview her confidantes.

also requested that Shertzer pick Shuman up from school at that time. Shertzer arrived at the school around 2:00 p.m.

On December 13th, Shertzer received a letter dated December 10, 2001, indicating that Shuman would be suspended from December 11, 2001 until December 14, 2001, for "Sexual harassment[.] More specifically: Inappropriate conduct." A. 982. The letter also stated that Shuman and Shertzer were required to attend a reinstatement conference with Gale before Shuman could return to school. Shuman's reinstatement conference was held on December 14, 2001, and was conducted by Janice M. Mindish ("Mindish"), the principal of the Penn Manor High School, and Gale. Shuman attended with his mother, his step-father, and his attorney. Shuman returned to school on December 17, 2001.

On June 5, 2002, by and through his mother, Shuman filed a Complaint in the United States District Court for the Eastern District of Pennsylvania, alleging a series of federal constitutional and state law claims.[2] On August 27, 2002, the District Court granted in part

_____

[2]Shuman's Complaint originally named the following defendants: Penn Manor School District, Penn Manor School Board, C. Willis Herr, Richard L. Frerichs, Jeffrey E. Lyon, Patrick T. Kline, Donald H. Anderson, H. Thomas Herr, Kelly K. Withum, Donna Wert, Jeffrey Kreider, Dolores Warfel, Steve Syrocki, each individually and as members of the Penn Manor School Board; Gary B. Campbell, individually and as Superintendent of the Penn Manor School District; Donald Stewart, individually and as Acting Superintendent of the Penn Manor School District; Mindish, individually and as Principal of Penn Manor High School; Baddick, individually and as Assistant Principal of the Penn Manor High School; Gale, individually and as Dean of Students of the Penn Manor High School; and Carole Fay, individually and as a Teacher

and denied in part the defendants' motion to dismiss. The following claims in nine counts then remained: violation of procedural due process rights (in violation of the Fifth and Fourteenth Amendments); violation of Fourth Amendment rights; violation of the right to equal protection of the law under the Fourteenth Amendment; violation of First Amendment rights; intentional infliction of emotional distress; negligence; and negligent infliction of emotional distress. On May 17, 2004, the District Court granted the Penn Manor Defendants' motion for summary judgment on Shuman's First, Fourth, Fifth, and Fourteenth Amendment claims and dismissed his state law claims for lack of jurisdiction.

On June 15, 2004, Shuman filed a timely notice of appeal. On appeal, Shuman contends that the District Court erred in its determination that the Penn Manor Defendants did not violate Shuman's due process rights under the Fourth and Fourteenth Amendments and his right to equal protection under the Fourteenth Amendment. Shuman additionally argues that should the Court reverse any part of the District Court's decision, remanding the matter for trial, then his state law claims should be reinstated and heard by the District Court.

---

and Agriculture Coordinator of the Penn Manor High School.

By Orders dated June 24, 2003, October 1, 2003, and November 6, 2003, the District Court dismissed defendants Herr, Frerichs, Lyon, Kline, Anderson, Herr, Withum, Wert, Kreider, Warfel, and Syrocki from the action. On February 11, 2004, the court also dismissed Campbell from the action by stipulation of the parties. The remaining defendants in the action are the Penn Manor School District, Penn Manor School Board, Stewart, Mindish, Baddick, Gale, and Fay (collectively, "Penn Manor Defendants" or "the school"). On October 1, 2003, Counts I through VII were dismissed against Fay.

## II. STANDARD OF REVIEW

"We exercise plenary review over the District Court's grant of summary judgment" and "apply the same standard that the District Court should have applied." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276 (3d Cir. 2001). A court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating the evidence, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). While the individual pieces of evidence alone may not suffice to make out the claims asserted, we must review the record as a whole picture. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997).

This Court reviews questions of law *de novo*. *United States v. Hendricks*, 395 F.3d 173, 176 (3d Cir. 2005).

## III. DISCUSSION

Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States. *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000). This section does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right. *Id.* (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). To establish valid claims under § 1983, the plaintiff must demonstrate that the defendants, while acting under color of state law, deprived him of a right secured by the Constitution or the

laws of the United States. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995) (citing *Moore v. Tartler,* 986 F.2d 682, 586 (3d Cir. 1993)).

A.      Fourth Amendment Due Process Claim

Shuman alleges that the Penn Manor Defendants deprived him of his due process rights under the Fourth Amendment as a result of the school's investigation into the incident between Shuman and Becker. Shuman's Fourth Amendment claim stems from what he alleges was an unlawful seizure – i.e., when he was held in the administrative offices of Penn Manor High School from approximately 10:15 a.m. until 2:00 p.m. on December 10, 2001. Shuman does not challenge whether the intrusion was justified at its inception, which entailed the initial removal of Shuman from class or the initial questioning by Gale. Shuman concedes that these intrusions were justified due to Becker's allegations against him. Rather, Shuman alleges that the problem arose as the intrusion continued, where, according to Shuman, no further investigation was being done and he was detained for approximately three and one-half hours.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV. The Supreme Court has held that the Fourteenth Amendment extends this constitutional guarantee to searches and seizures by state officers, *Elkins v. United States*, 364 U.S. 206, 213 (1960), including public school officials, *New Jersey v. T.L.O.*, 469 U.S. 325 (1985) (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)). "The Fourth Amendment's 'principal concern . . . is with intrusions on privacy,' and therefore when the infraction deals not 'with the initial decision to detain an accused and the curtailment of liberty that such

9

a decision necessarily entails, but rather with the conditions of ongoing custody following such curtailment of liberty,' then the claim invokes principles of substantive due process." *Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 172 (3d Cir. 2001) (citing *Ingraham v. Wright*, 430 U.S. 651, 674 (1977)).

A seizure occurs for Fourth Amendment purposes when "a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). Based upon Shuman's uncontroverted testimony, he was told to remain in the conference room under Gale's direction for several hours and was not free to leave. He thus appears to have been "seized" within the meaning of the Fourth Amendment. *See Doe v. Haw. Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003) (finding student held to tree with tape for five minutes seized within meaning of Fourth Amendment); *cf. Gottlieb*, 272 F.3d at 172 (finding momentary use of physical force by teacher not seizure within meaning of Fourth Amendment). Nonetheless, that Shuman was "seized" is but the first part of the analysis. It must still be determined whether the seizure constituted a violation of his Fourth Amendment rights.

With limited exceptions, a search or seizure requires either a warrant or probable cause. *See, e.g.*, *Camara v. Mun. Court*, 387 U.S. 523, 528-29 (1967) ("[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."); *T.L.O.*, 469 U.S. at 340-41 ("Ordinarily, a search -- even one that may permissibly be carried out without a warrant -- must be based upon 'probable cause' to believe that a violation of the law has occurred."). One such limited exception was recognized by the Supreme Court in *T.L.O.* with respect to searches of students in public schools:

10

> [T]he accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search.

*T.L.O.*, 469 U.S. at 341. *T.L.O.* thus established that searches conducted in public schools are governed by the reasonableness standard, and "what is reasonable depends on the context within which a search takes place . . . . 'balancing the need to search against the invasion which the search entails.'" *Id.* at 337 (citing *Camara*, 387 U.S. at 528). *T.L.O.* solely addressed the standard applied to searches in public schools, however, and thus left open the appropriate standard governing seizures in that context.

At oral argument, we asked the parties to brief for the Court the appropriate standard governing seizures in this context. The Penn Manor Defendants vigorously argued that we should adopt the "arbitrary, capricious, or for the purpose of harassment" standard, applied by the California Supreme Court in *In re Randy G*, 28 P.3d 239 (Cal. 2001), a case brought by a California public school student alleging a seizure by his school in violation of the Fourth Amendment. The Penn Manor Defendants contend that this reduced standard should be applied in light of the different and distinct interests implicated by a search rather than a seizure, particularly the heightened level of intrusion that a search entails. Furthermore, because the reasonableness standard applies in the criminal context to police investigatory searches, the Penn Manor Defendants contend that a reduced standard should correspondingly apply in the public

11

school context.  We decline to follow the Penn Manor Defendants' suggested approach.

Relying upon *T.L.O.*, other courts of appeals to consider the issue have concluded that reasonableness is the appropriate benchmark to determine whether a seizure in the public school context survives Fourth Amendment scrutiny.  These courts of appeals have largely rested their decisions upon their recognition of the unique responsibilities public schools bear, particularly with regard to disciplinary matters.  In *Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1014 (7th Cir. 1995), the Seventh Circuit adopted a reasonableness approach holding that "in the context of a public school, a teacher or administrator who seizes a student does so in violation of the Fourth Amendment only when the restriction of liberty is unreasonable under the circumstances then existing and apparent."  The Fifth Circuit also adopted this standard in *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079 (5th Cir. 1995), specifically noting that "while school officials are subject to the limitations of the [F]ourth [A]mendment, the reasonableness of seizures must be determined in light of all of the circumstances . . . ." *See also Doe*, 334 F.3d at 909 ("In applying the Fourth Amendment in the school context, the reasonableness of the seizure must be considered in light of the educational objectives [the school vice-principal] was trying to achieve."); *Milligan v. City of Slidell*, 226 F.3d 652, 654 (5th Cir. 2000) ("Balancing renders essential a consideration of the context in which a Fourth Amendment right is asserted.  Because this case involves the rights of students in a public school . . . the nature of those rights is what is appropriate for children in school."); *Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989) ("We believe that the same considerations which moved the Supreme Court to apply a relaxed Fourth Amendment standard in cases involving school searches support applying the same standard in school seizure cases.").

12

We join these courts of appeals in finding seizures in the public school context to be governed by the reasonableness standard, giving special consideration to the goals and responsibilities of our public schools. There is simply no Third Circuit or other federal precedent which supports an application of the more lenient "arbitrary, capricious, or for the purpose of harassment" standard advocated by the Penn Manor Defendants. The reasonableness standard is also consistent with the reduced liberty interest afforded students in the public school setting. While "[w]e know that students do not completely surrender their constitutional rights at the schoolhouse gate, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), . . . 'the nature of those rights is what is appropriate for children in school.'" *Wallace*, 68 F.3d at 1013 (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995)). Compulsory attendance laws automatically inhibit the liberty interest afforded public school students, as the law compels students to attend school in the first place. *See id.* "Once under the control of the school, students' movement and location are subject to the ordering and direction of teachers and administrators." *Id.*

We thus turn to the question of whether the school's seizure of Shuman was reasonable in light of the circumstances. Shuman complains that he was forced to remain in the small conference room outside of Gale's office from 10:15 a.m. until approximately 2:00 p.m. This detention lasted no more than four hours. During that time, Shuman was allowed to do his agricultural science work and was able to leave the room to eat lunch in the cafeteria and to get a drink of water; however, he was not otherwise permitted to come and go freely or to attend his regularly scheduled classes. The purpose of Shuman's detainment was for the school to investigate the incident of sexual misconduct, including Becker's accusations, and to determine an appropriate punishment. In light of the serious nature of Becker's accusations, or at a minimum, the misconduct which

13

Shuman admitted to, it was reasonable for the school to detain Shuman to investigate this behavior. *Cf. Hassan*, 55 F.3d at 1080 (finding confinement of misbehaving student for fifty minutes in room at juvenile detention center during school-sponsored field trip reasonable in light of presence of other potentially dangerous juveniles).

### B.  Fourteenth Amendment Due Process Claim

Shuman additionally claims a violation of his Fourteenth Amendment due process rights, on account of the school's alleged failure to give him notice and an opportunity to present his side of the story prior to his four-day suspension.

Under the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV, § 1.  "Protected interests in property are normally 'not created by the Constitution.  Rather, they are created and their dimensions are defined' by an independent source such as state statutes or rules entitling the citizen to certain benefits." *Goss v. Lopez*, 419 U.S. 565, 572-73 (1975) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  Here, on the basis of state law, Shuman has a legitimate claim of entitlement to a public education.[3] *Cf. id.* at 573 (finding that on the basis of Ohio state law, appellees had a legitimate claim of entitlement to public education).

Once it is determined that due process applies, the question still remains what process is due. *Id.* at 577.  In *Goss*, the Supreme

---

[3]Under the Pennsylvania Administrative Code, "[e]ducation is a statutory right, and students must be afforded all appropriate elements of due process if they are to be excluded from school." 22 PA. CODE § 12.8(a) (2005).

Court laid down the minimum process required with respect to a suspension of ten days or less of a public school student. "[I]n connection with a suspension of 10 days or less . . . the student [must] be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. "The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Id.* Furthermore,

> There need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is. . . . Since the hearing may occur almost immediately following the misconduct, it follows that as a general rule notice and hearing should precede removal of the student from school.

*Id.* at 582.

Based upon Shuman's own admissions of the notice and process provided, the minimum protections established by the

15

Supreme Court in *Goss* were satisfied.[4]   Shuman stated at his deposition:

> And [Gale] said that she was claiming that I physically forced my hand upon her, and that she was very upset about it.  And then I told him what I just went through and told you during the whole story and he said the stories weren't matching and asked me if I knew about what she was talking about.

A. 161 (Dep. Shuman).  Thus, by Shuman's own declarations, Gale orally gave Shuman notice of the allegations and an opportunity to

---

[4]Shuman additionally argues that Pennsylvania law and the Penn Manor Policy Manual entitle a student to an informal hearing when a suspension is for more than three days.  He further argues that under Title 22, Section 12.8 of the Pennsylvania Administrative Code, certain other due process requirements are to be observed in regard to the informal hearing, including, *inter alia*, the right to speak and produce witnesses on his own behalf and the right to question any witnesses at the hearing.  See 22 PA. CODE § 12.8(a) (2005).  Though Shuman concedes that a violation of the Pennsylvania Code or of the Penn Manor Policy Manual does not alone establish a violation of due process, he nonetheless argues that these sources are relevant in determining the adequacy of the procedures used.

Shuman is incorrect so far as federal law is concerned.  It is well-accepted that "state law does not ordinarily define the parameters of due process for Fourteenth Amendment purposes; rather, the minimum, constitutionally mandated requirements of due process in a given context and case are supplied and defined by federal law, not by state law or regulations." *Patterson v. Armstrong County Children & Youth Servs.*, 141 F. Supp. 2d 512, 537 (W.D. Pa. 2001) (citing *Davis v. Scherer*, 468 U.S. 183, 194 (1984)).

present his side of the story. Procedural due process in this context requires nothing more. *Cf. S.G. v. Sayreville Bd. of Educ.*, 333 F.3d 417, 424 (3d Cir. 2003), *cert. denied*, 540 U.S. 1104 (2004) (finding no Fourteenth Amendment due process violation where school principal met with student before imposing three-day suspension, asked student to explain what he said and did, and student admitted the relevant behavior).

C.      Fourteenth Amendment Equal Protection Claim

Shuman also claims that he was denied equal protection because the school chose to ignore evidence proving that the sexual misconduct involving Becker was consensual and instead chose only to discipline him. The basis for Shuman's claim is that he was subjected to this alleged differential treatment because of his gender.

Under the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. This is essentially a direction that all persons similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). In order to bring a successful section 1983 claim for the denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. *Andrews v. City of Phila.,* 895 F.2d 1469, 1478 (3d Cir. 1990) (citing *Batson v. Kentucky*, 476 U.S. 79, 93 (1986)). In other words, they must demonstrate that they received different treatment from that received by other individuals *similarly situated*. *Id.* (citing *Kuhar v. Greensburg-Salem Sch. Dist.*, 616 F.2d 676, 677 n.1 (3d Cir. 1980)). Specifically, to prove sexual discrimination, a plaintiff must show that any disparate treatment was based upon his gender. *Id.* (citing *Bohen v. City of East Chicago*, 799 F.2d 1180, 1186-87 (7th Cir. 1986)).

17

The threshold question thus becomes whether Shuman and Becker, though perhaps treated differently, were in fact similarly situated in the first place. We answer this question in the negative. First, Shuman admitted to some form of misconduct; Becker did not. Additionally, Becker accused Shuman of wrongdoing; Becker herself was not accused of any wrongdoing, other than Shuman's charge that Becker willingly took part in the sexual misconduct at issue. The school's investigation of Shuman and subsequent punishment were a direct result of these factors. Because Shuman and Becker were not similarly situated, Shuman's equal protection claim must fail. *Cf. DeHart v. Horn*, 390 F.3d 262, 272 (3d Cir. 2004) (affirming summary judgment on equal protection claim because Buddhist inmate not similarly situated to Jewish and Muslim inmates for purposes of dietary accommodations where Buddhist inmate's proposed accommodations were more burdensome than those of Jewish and Muslim inmates).

## IV. CONCLUSION

Because we find no violation of Shuman's Fourth or Fourteenth Amendment rights, we will affirm the judgment of the District Court.