Janice **HAZEL**, Plaintiff Below, Appellant,

v.

**DELAWARE SUPERMARKETS, INC.,** Edy's Grand Ice Cream, a California Corporation, and Dreyer's Grand Ice Cream Holdings, Inc., a Delaware Corporation, Defendants Below, Appellees.

No. 210, 2007.

Supreme Court of Delaware.

Submitted: June 25, 2008.

Decided: July 14, 2008.

L. Vincent Ramunno and Lawrence Ramunno (argued), Esquires, of Ramunno, Ramunno & Scerba, P.A., Wilmington, Delaware; for Appellant.

Timothy H. Rohs and Richard D. Abrams (argued), Esquires, of Mintzer, Sarowitz, Zeris, Ledva & Meyers, Wilmington, Delaware; for Appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice, for the Majority.

Janice Hazel ("Hazel"), the plaintiff below, appeals from an order of the Superior Court granting summary judgment to the defendants below, Delaware Supermarket,

Inc. ("DSI"), Edy's Grand Ice Cream ("Edy's"), and Dreyer's Grand Ice Cream Holdings, Inc. ("Dreyer's"), and dismissing her action for personal injuries resulting from her fall in a supermarket operated by DSI. On appeal, Hazel claims that the Superior Court erred in granting summary judgment to the defendants, because (i) Hazel made the required *prima facie* showing of negligence, and (ii) the defendants have not demonstrated that there are no genuine issues of material fact and that as a matter of law the undisputed material facts preclude a finding of negligence. We agree and, therefore, reverse and remand.

### *FACTS*

On July 2, 2003, Hazel slipped and fell in the frozen food aisle of the Stanton ShopRite supermarket that was operated by DSI. Hazel, who was wearing "flip-flops," was pushing a shopping cart in the frozen food aisle. According to her testimony, she fell near a square wooden pallet that (Hazel was "99.9 percent sure") contained ice cream. Hazel described the pallet as follows:

"What I mean [by] a pallet, [is that] it seemed like it was off the ground a little bit. I'm going to guess it was made of wood or something, but there was a stack of something there. I remember it having some sort of plastic over it and . . . it seemed like there was some sort of [frost] on the plastic. [ . . . ] It was full, and I'm pretty sure it was ice cream. If it wasn't ice cream, it was something cold that made the plastic seem like it had a frosty thing on it. [ . . . ] I actually . . . saw some frost on it. It seemed like it may have been sitting there for a while."

Hazel did not notice any water on the floor either before or after her fall, but indicated that she felt her legs "slide," and that after the fall she touched her calf with her hand, and her hand was wet. Hazel did not know where the water came from. As a result of the fall, Hazel's rear end hit the floor, her legs went under the shopping cart, and her knee hit the metal part underneath the cart.

At the time of Hazel's injury, Michael Klingensmith ("Klingensmith"), an employee of Edy's, was stocking ice cream in Edy's freezers, which were located in that aisle 12 or 15 freezer doors away from where Hazel fell. Klingensmith testified that he would bring the ice cream from the freezers located at the back of the store to the sales floor in a shopping cart. He would then transfer the ice cream from the cart into the aisle freezers. Klingensmith agreed that occasionally a "product would get condensation on it and drip on the floor between the time [he] g[o]t it from the freezer and finish[ed] packing it out on the sales floor." In such cases, Klingensmith would "clean it up with paper towels and get a wet floor sign, if [the frozen product] is sitting there for a while."

After witnessing Hazel's fall, Klingensmith made the following notation: "7–2–03. Saw lady fall in the aisle. Said she hurt her back. Saw a little bit of water." In his deposition, Klingensmith explained that, three or four minutes after Hazel fell, he and the frozen food manager inspected the area. The inspection revealed an amount of water on the floor about the size of a quarter. Klingensmith could not remember where he saw the water or whether the floor was cleaned after the incident.

Another person who witnessed Hazel's fall was Jeanne O'Connor ("O'Connor"), who was working for Mellita, a coffee company. O'Connor's job was to fill Mellita coffee machines located in ShopRite

stores, and to take inventory.[1] At the time of the incident, O'Connor was on a ladder filling a Mellita coffee machine located in the frozen food aisle, close to where Hazel fell. O'Connor's written report stated: "The lady was in front of the ice cream case when she just sort of went down. It didn't look to me like she tripped over anything. I went over there but I didn't see any water or objects on the floor. She was wearing very thin flip-flops which I knew are easy to trip over. I was ... high up a ladder when I observed her and she was complaining about her ... back. It didn't look to me like a slip, it was just going straight down as if her knee gave way." O'Connor further testified that she went over to Hazel and offered to help her, but Hazel refused and stood up without assistance, stating: "Oh, just what I need, another problem with my knee." A ShopRite cashier then told Hazel that she could report the incident at the courtesy counter.

Hazel testified that as she left the frozen food aisle to go to the courtesy counter, she saw a ShopRite employee heading with a roll of paper towels towards the area where she fell. At the courtesy counter, Hazel reported the incident to William Yanchulis ("Yanchulis"), the assistant store manager, who then noted the following: "Front office called me for a customer who fell. I asked the customer what happened, she said she fell on something. She stated that she did not have insurance and needed a contact person. She said something pulled in her back and she had back surgery about one year ago. Her ... knee was bruised on the left and ... right skin bruised. She had flip-flops on. Inspection of floor showed nothing. Floor was cleaned and no wet spots."[2] Although Yanchulis' written report stated that the floor was "cleaned," in his deposition Yanchulis testified that he meant that the floor was "clean" and that nobody had "cleaned" the floor after the fall.

Hazel went home and put ice on her knee. Because the pain became "intense," Hazel's son took her to the hospital. The hospital doctor gave Hazel a prescription for pain medication and advised her to consult her family doctor. Hazel told her family doctor about her back pain and her recent back surgery. She then saw an orthopedic doctor who fitted her with a brace and recommended physical therapy. Hazel attended physical therapy sessions infrequently because she was uninsured.

Hazel filed suit in the Superior Court against DSI alleging negligence and seeking recovery for the injuries she sustained as a result of her fall. DSI filed a third-party complaint against Edy's and Dreyer's, seeking indemnification or contribution. All three defendants subsequently moved for summary judgment. The Superior Court "reluctantly" granted the motions, holding that "there is no evidence from which to argue negligence" because "there is nothing ... in the record which said what caused it" and "[w]hether it was a substance that [Hazel] brought in or the supermarket left there or some patron dropped ... a minute or hour or day before, we simply do not know."

This appeal followed.

### ANALYSIS

We review a Superior Court decision granting summary judgment *de*

---

**1.** At the time of Hazel's fall, O'Connor was not a ShopRite employee but she had submitted an application for employment. By the time of her deposition, O'Connor had become employed at ShopRite.

**2.** Yanchulis deposition transcript (emphasis in original).

*novo.*[3] In an action for personal injuries resulting from a defendant's breach of its "duty to keep the [ ] store premises in a reasonably safe condition for the use of the [ ] customers,"[4] the plaintiff must show that (1) there was an unsafe condition in the defendant's store (2) which caused the injuries complained of, and (3) "of which the storekeeper had actual notice or which could have been discovered by such reasonable inspection as other reasonably prudent storekeepers would regard as necessary."[5] Conversely, a defendant moving for summary judgment has the burden of "producing evidence of necessary certitude demonstrating that there is no genuine issue of fact relating to the question of negligence and that the proven facts preclude the conclusion of negligence on its part."[6]

■ Because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial,"[7] we must first determine whether Hazel made a showing sufficient to establish the existence of the essential elements of her negligence claim. Viewing the evidence and all reasonable inferences that can be drawn therefrom in a light most favorable to the nonmoving party (here, Hazel), we conclude that Hazel met her burden of making a *prima facie* showing of negligence. We further conclude that DSI did not meet its burden of establishing that there are no genuine issues of material fact and that the undisputed material facts legally preclude a finding of negligence on the part of the defendants.

■ First, Hazel made a sufficient showing that there was an unsafe condition in the supermarket, namely, water on the floor in the frozen food aisle.[8] Although both O'Connor and Yanchulis testified that they observed no water on the floor after the incident, Hazel testified that she felt water on her calf, and Klingensmith's report indicates that three or four minutes after the fall he observed a "little bit of water." The Superior Court correctly noted that Klingensmith's report contains no precise indication as to the location of the water. Nonetheless, it is reasonable to infer that, because his report was prompted by Hazel's fall, the water Klingensmith observed was at the area where Hazel fell. That Hazel saw no water on the floor

---

3. *Shea v. Matassa,* 918 A.2d 1090, 1093 (Del. 2007).

4. *Wilson v. Derrickson,* 175 A.2d 400, 402 (Del.1961).

5. *Howard v. Food Fair Stores, New Castle, Inc.,* 201 A.2d 638, 640 (Del.1964) (citing *Robelen Piano Co. v. Di Fonzo,* 169 A.2d 240, 243–44 (Del.1961)).

6. *Howard,* 201 A.2d at 640 (citing *Ebersole v. Lowengrub,* 180 A.2d 467, 469–70 (Del.1962) where this Court held that "[g]enerally speaking, issues of negligence are not susceptible of summary adjudication"). *See also Jones v. Tsoukalas,* 1990 WL 105002, at *3 (Del.Super.Ct.) (holding that "the question of whether the defendant should have known of the dangerous condition is a question of defendant's negligence, and issues of negligence generally are not susceptible of summary adjudication").

7. *Burkhart v. Davies,* 602 A.2d 56, 58–59 (Del. 1991) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (holding that the moving party is entitled to summary judgment where the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof).

8. *See Jones,* 1990 WL 105002, at *2 (denying defendant's summary judgment motion in part because "[t]he existence or non-existence of a dangerous condition must depend upon the facts and circumstances of each case and is generally a question of fact for the jury to determine except in very clear cases").

before she fell is not dispositive. It is well-established Delaware law that "[a] customer coming into a store has the right to assume that the floor is suitable and safe to walk upon, and is free from obstacles and defects which might cause a fall."[9]

Hazel's contention that there was water on the floor is further supported by (i) the fact that she observed a ShopRite employee carrying a roll of paper towels and heading towards the area where she fell, and (ii) Yanchulis' written report indicating that the floor was "cleaned" after the incident. Yanchulis' post-report deposition testimony that the floor was never "cleaned" and that his report inadvertently stated that the floor was "cleaned" when he actually meant that the floor was "clean," merely creates an issue of material fact that is properly for a jury to resolve.

Second, Hazel also presented sufficient evidence to defeat summary judgment with respect to causation. Hazel testified that she felt her legs "slide" on something, which is consistent with her testimony that after her fall she felt water on her calf.[10] O'Connor's report provided a different perspective. O'Connor noted that Hazel's fall was more likely to be attributable to the fact that Hazel wore "very thin flip-flops which [O'Connor] knew are easy to trip over" and/or to Hazel's previous medical problems (because Hazel went "straight down as if her knee gave way" and then said "Oh, just what I need, another problem with my knee.") At most, however, O'Connor's non-expert testimony served only to create another genuine issue of material fact. It was for a jury to determine whose testimony—Hazel's or O'Connor's—was more credible.

Third, Hazel made a *prima facie* showing that the defendants should have been aware of the dangerous condition, and that by failing to discover it and to take reasonable measures to prevent injuries to customers, they were negligent. Hazel's testimony suggested two potential sources for the water on which she claims to have slipped: (1) the pallet of ice cream that had frost on it and was located near where she fell; and/or (2) Klingensmith's stocking ice cream in the freezers, which required Klingensmith to transport the ice cream, in a shopping cart, from the freezers located at the back of the store to the

---

9. *Howard*, 201 A.2d at 642 (noting that "a customer walking along an aisle of a store glancing at shelves displaying merchandise lining the aisle may be excused from keeping a constant lookout on the floor to observe a dangerous condition, particularly in view of the customer's right to assume a safe condition on the floor").

10. *See Howard*, 201 A.2d at 641 (reversing grant of summary judgment to defendants where, although it had not been shown "precisely what the condition was," the fact that plaintiff's "both feet slipped out from under her ... warrants the conclusion that such fall was caused solely by a slippery condition on the floor"). *See also Burris v. Penn Mart Supermarkets, Inc.*, 2006 WL 2329373, at *2 (Del.Super.Ct.) (denying defendant's summary judgment motion where plaintiff testified that after the fall his clothes were wet, because "[a]lthough [plaintiff] could not identify the substance, this testimony alone creates an issue of fact that must be resolved by the trier of fact"); *Brinkley v. Cat Enterprises, Inc.*, 1994 WL 146018, at *1 (Del.Super.Ct.) (denying defendant's summary judgment motion although plaintiff "candidly admitted she did not know what caused her fall"); *Rowan v. Toys 'R' Us, Inc.*, 2004 WL 1543238, at *2 (Del.Super.Ct.) (denying defendant's motion for summary judgment where plaintiff did not know what caused her fall and there was an apparent absence of any moisture on the floor, but the evidence permitted inferences that "the defendant was aware that the floor could be slippery at the entrance during periods of rainfall because of the usual practice of placing a warning sign and having a mat there," which precautions had not been taken that day).

sales floor and to then transfer the ice cream from the cart into the aisle freezers. Under either scenario, the record contains evidence sufficient to permit a reasonable juror to conclude that DSI and/or Edy's should have known that water might be present on the floor, thus requiring them to take preventive measures to ensure customer safety—measures that the defendants undisputedly did not take.[11]

Hazel testified that she saw "frost" on the pallet of ice cream, and that the pallet looked as though it "may ha[ve] been sitting there for a while." Experience shows that when frozen products are left outside a freezer for a period of time, frost and condensation may form and water may leak as a result.[12] A reasonable jury could conclude that DSI should have known that water might have been on the floor in the frozen food aisle, near the ice cream pallet where Hazel fell.

Similarly, with respect to Klingensmith transporting the ice cream for stocking in the aisle freezers, the evidence of record would permit a jury to conclude that DSI and/or Edy's should have known that such activity could result in water dripping on the floor. Klingensmith admitted that occasionally a "product would get condensation on it and drip on the floor between the time [he] g[o]t it from the freezer and finish[ed] packing it out on the sales floor." He also stated that, as a preventive measure, he would place "a wet floor sign, if [the frozen product] is sitting there for a while." It is undisputed that no wet floor signs were placed in the frozen food aisle at the time of Hazel's fall.

■ Whether the presence of the water was caused by the ice cream pallet or Klingensmith's activity (as Hazel claims), or by some unrelated cause for which the defendants might not be responsible, was an issue of material fact that, in our view, precluded the entry of summary judgment in the defendants' favor.[13]

11. Other courts have reached the same conclusion in cases involving similar facts and evidence. *See, e.g., Barrett v. Red Food Stores, Inc.,* 1992 WL 33891 (Tenn.Ct.App.) (holding that even though the plaintiff, who slipped and fell in a frozen food aisle in the store at a time when an employee was stocking the ice cream freezer located in the aisle, testified that "she did not see any water, know how much water was on the floor, or know how long the water had been on the floor," plaintiff had presented sufficient evidence that "the spilling of water by the floor during ice cream deliveries was a recurring incident or common occurrence," which raised a jury question as to "[w]hether or not the proprietor took reasonable precautions to protect customers from injury"); *Ruppel v. The Kroger Company,* 2000 WL 33232321 (W.D.Va.) (finding that although there was no direct evidence of water on the ground where the plaintiff fell aside for her testimony that after the fall she felt that her pant legs were wet, there was sufficient evidence to enable a reasonable jury to conclude that the defendant had been negligent where a store employee stated that he was in the process of restocking the frozen food shelves when plaintiff fell and that it was "a common occurrence" for water to leak from the carts he used to transport frozen items to the aisles, and plaintiff testified that she had also seen "frozen items sitting on the floor").

12. Any water formed on the pallet of ice cream would normally leak underneath the pallet—which was "off the ground a little bit." Given sufficient volume, water could have spread outside the perimeter of the pallet for the short distance to the area where Hazel fell.

13. In that respect, this case is distinguishable from *Wilson v. Derrickson,* 175 A.2d 400, 402 (Del.1961) on which the defendants rely. In *Wilson* we affirmed a directed verdict for the defendants where there was "a complete failure to prove that the defendants had any knowledge of, or reason to suspect, the presence on the floor of a condition dangerous to their customers," whereas here, the plaintiff has presented sufficient proof that a dangerous condition existed on the floor and that the

## CONCLUSION

For these reasons, we conclude that the Superior Court erred in granting summary judgment to the defendants. We therefore reverse and remand for further proceedings consistent with this Opinion.

BERGER, Justice, dissenting, with STEELE, Chief Justice, joining.

Negligence claims generally present issues of fact that must be decided by a jury. Moreover, on a motion for summary judgment, the evidence and all reasonable inferences that can be drawn from the evidence must be viewed in the light most favorable to the non-moving party. This deferential standard, however, has its limits. "[N]egligence is never presumed from the mere fact that the plaintiff has suffered an injury." [14] Where, as here, Hazel relies on circumstantial evidence, the conclusion that DSI was negligent "must be the only reasonable inference possible from the admitted circumstances. If the proven circumstances are as consistent with the absence of negligence as with the existence of negligence, neither conclusion can be said to have been established and, accordingly, it would follow that a *prima facie* case of negligence has not been established...." [15]

We agree with the majority that the record creates a triable issue of fact as to the reason for Hazel's fall. She says there was something slippery on the floor and that her leg felt wet after the fall. Thus, we must assume at this point that there was water on the floor, and that the water caused her to slip. The real issue is whether DSI knew or should have known that this dangerous condition existed. It is at this point in the analysis that the

majority impermissibly speculates about possible scenarios that would support Hazel's claim. First, the majority says that water may have dripped from the pallet of ice cream. Hazel testified that the pallet had frost on it and she slipped a few feet from the pallet. From these two facts, the majority says that water could have dripped from the pallet onto the floor and spread into the aisle where Hazel fell. To reach this conclusion, one would have to assume that enough water dripped down from the pallet to create a pool of water that spread a foot or two into the aisle where Hazel slipped. But the record refutes such an assumption, as all witnesses testified that there was no pool of water. At most, there was a drop of water the size of a quarter. Thus, there is no basis to infer that the water came from the pallets.

Alternatively, the majority suggests that Hazel slipped on water that dripped from the frozen food that Klingensmith was stacking in a freezer cabinet. But it is undisputed that Klingensmith was stacking food 12–15 cabinet doors away from the area where Hazel fell—a point to which Hazel's travels had yet to take her. Thus, the only way this scenario makes sense is if we assume that: i) Klingensmith walked his cart of frozen food past the spot where Hazel fell; and ii) during the time it took to walk from the freezer room to the point where Hazel fell, the frozen food started to melt and dripped on the floor. A scenario the facts undisputedly do not support. Klingensmith and cart traveled from the stock room directly to stand up freezers, 12–15 feet in the opposite direction of Hazel's travels. He and his frozen ice cream cargo never crossed her path, nor did he

defendants, who should have been aware of the presence of that condition, failed to take any preventive measures.

14. *Wilson v. Derrickson*, 175 A.2d at 401.

15. *Ibid.*

pass the pallet or "coffin freezers" located near her fall.

In sum, the evidence only supports a conclusion that Hazel fell on something wet. That wet substance could have come from another customer's shopping cart, a spilled power drink, condensation from frozen food, or a number of other theoretical possibilities. The source of the water is a matter of pure speculation. Accordingly, the trial court correctly granted summary judgment.