Anthony J. HUNT, a minor, by his next friend, Lisa C. DeSOMBRE, and Lisa C. DeSombre, individually, Plaintiffs Below, Appellants,

v.

The STATE of Delaware, The DEPART-MENT OF SAFETY AND HOME-LAND SECURITY, the DIVISION OF the DELAWARE STATE POLICE, and Trooper Pritchett, Defendants Below, Appellees.

No. 488, 2012.

Supreme Court of Delaware.

Submitted: April 3, 2013.
Decided: June 25, 2013.

William D. Fletcher, Jr., Esquire and Noel E. Primos, Esquire (argued), Schmittinger & Rodriguez, P.A., Dover, Delaware, for Appellants.

Michael F. McTaggart, Esquire, and Marc P. Niedzielski, Esquire (argued), Department of Justice, Wilmington, Delaware, for Appellees.

Before STEELE, Chief Justice, HOLLAND and BERGER, Justices.

BERGER, Justice:

This appeal involves alleged torts and a civil rights violation, arising from a police officer's interrogation of a young child at school. The Superior Court granted summary judgment to the State and all other remaining defendants. Viewing the record in the light most favorable to the child, we hold that there is sufficient evidence to support all claims except the battery claim. Accordingly, we affirm in part and reverse in part.

**Factual and Procedural Background**

On January 30, 2008, David McDowell, Vice Principal of the Richard A. Shields Elementary School, asked Delaware State Trooper David Pritchett to come to the school and talk to a small group of students about bullying. At the time, Pritchett was on a four month assignment as the School Resource Officer (SRO) for the Cape Henlopen School District. Under the Agreement Between the Cape Henlopen School District and the Delaware State Police, an SRO is tasked with "creating and maintaining a safe, secure, and orderly environment for students, teachers, and staff."[1] The SRO "represents a proactive strategy designed to bring crime prevention and intervention into the school."[2] The agreement states that the SRO is to be assigned to the high school, but Pritchett said that he was the SRO for all schools in the district.

In any event, Pritchett gave a talk about bullying to four or five fifth grade students who were under "in-school suspension." McDowell was present during the entire presentation. The next day, McDowell was told that there had been another bullying incident involving an autistic student whose money had been taken from him on the school bus. One of the fifth graders serving in-school suspension told McDowell that "AB," another fifth grade student, sat behind the autistic student on school bus, and took the money. McDowell then told AB's mother about the incident, and asked her permission to have Pritchett talk to AB about it. AB's mother consented, and McDowell again asked Pritchett to come to the school.

When Pritchett arrived, McDowell told him what had happened, including how he learned that AB had taken the money. McDowell asked Pritchett to question AB, and the two men went to the reading lab, where AB was waiting. McDowell was called away on a school emergency, leaving Pritchett alone with AB. Pritchett got AB to admit that he had the money (one dollar); but AB claimed that another student had taken the money from the autistic student. AB said that he did not know that other student's name, but that the student was seated with AB on the school bus.

Without discussing the matter with McDowell, Pritchett followed up on AB's claim that another student had taken the money. He did so despite being virtually certain that AB was the perpetrator. Pritchett obtained the school bus seating chart from a secretary, and determined

1. Appellants' Appendix, A–90.

2. *Ibid.*

that Anthony J. Hunt's seat was next to AB's. He then instructed the secretary to call Hunt to the office. Pritchett greeted Hunt in the hall outside the office and walked him to the reading lab, where AB was seated. While walking, Pritchett claims that he told Hunt that "[t]here's a boy in here that's claiming that you ... took a dollar. I know that you didn't do that. You're not in any trouble. I just need you to be brave and come in here."[3] Pritchett also claims to have instructed Hunt, "When I tell you—when I tell the story of what's happened and I look at you, you just say no, you didn't do it...."[4]

Once inside the reading lab room with AB and Hunt, Pritchett questioned Hunt about the bullying incident. Pritchett closed the door, and told the boys what would happen to them if they lied. According to Hunt, Pritchett used a mean voice and told him 11 or 12 times that Pritchett had the authority to arrest Hunt and place him in jail if he did not tell the truth. Pritchett also explained that bad children are sent to the Stevenson House, where people are mean and children are treated like criminals. Pritchett said that if Hunt were sent to the Stevenson House, his siblings would be upset and would not be able to see him. Hunt started to cry. As soon as Hunt appeared visibly shaken, Pritchett turned to AB and stated "this is crazy now, [AB]. Look at him [referring to Hunt]. He's over there, his eyes are—you know, you can tell he looks like he's about ready to cry."[5] AB finally admitted to taking the money from the autistic student. After the confession, Pritchett claims to have told Hunt that he did "a great job."[6] Pritchett says that he asked Hunt if he wanted Pritchett to call his parents, but Hunt said, "No."[7] Pritchett also testified that he told Hunt "it takes a man to stand up to a bully like this is here."[8] Hunt did not recall any such comments.

When he got home from school, Hunt told his mother, Lisa DeSombre, what had happened. Hunt withdrew from school and was home schooled for the rest of that school year. Hunt returned to public school approximately 18 months after the incident. DeSombre filed suit on her son's behalf, as well as individually, against the Cape Henlopen School District, the Board of Education of Cape Henlopen School District, and David McDowell (collectively, District Defendants), and the State of Delaware, the Department of Safety and Homeland Security, the Division of the Delaware State Police, and Trooper Pritchett (collectively, Pritchett). Hunt's claims against the District Defendants have been resolved. Pritchett successfully moved for summary judgment. This appeal followed.

### Discussion

This Court reviews a grant of summary judgment *de novo.*[9] Thus, like the trial court, this Court must "examine the record to determine whether, viewing the facts in the light most favorable to the nonmoving party, the moving party has demonstrated that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a

3. Appellees' Appendix, B–62.

4. *Ibid.*

5. Appellees' Appendix, B–71.

6. *Ibid.*

7. *Ibid.*

8. *Ibid.*

9. *Hazel v. Del. Supermarkets, Inc.,* 953 A.2d 705, 708–09 (Del.2008).

matter of law."[10] The moving party is entitled to judgment as a matter of law when the nonmoving party has failed to make a sufficient showing of proof on an essential element of the case for which he or she has the burden of proof.[11]

### Section 1983 Claim

Federal law, specifically 42 U.S.C. § 1983, "imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States."[12] To prevail on his § 1983 claim, Hunt must establish that: (1) he was deprived of a federal right, and (2) Pritchett was acting under color of state law.[13] In addition, Hunt must establish that Pritchett's conduct is not protected by qualified immunity.[14] To overcome qualified immunity, Hunt must demonstrate that Pritchett's conduct violated a "clearly established" right. That means it must be "clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."[15] The determination "must be undertaken in light of the specific context of the case, not as a broad general proposition[.]"[16]

The Fourth Amendment guarantees the right to be free from unreasonable seizures.[17] "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."[18] A seizure occurs for Fourth Amendment purposes when "a reasonable person would have believed that he was not free to leave."[19] A search or seizure, subject to certain exceptions, requires either a warrant or probable cause.[20] In *New Jersey v. T.L.O.*, the United States Supreme Court recognized one such exception with respect to searches of students in public schools:

> [T]he accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search.[21]

*T.L.O.* only specified the standard applied to searches in public schools. It did not

10. *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991) (citation omitted).

11. *Ibid.*

12. *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir.2005) (citation omitted).

13. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980).

14. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

15. *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citation omitted).

16. *Id.* at 201, 121 S.Ct. 2151.

17. U.S. Const. amend. IV; *Terry v. Ohio*, 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

18. *Terry*, 392 U.S. at 16, 88 S.Ct. 1868.

19. *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (quotation and internal quotation marks omitted).

20. *See, e.g., N.J. v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *Camara v. Mun. Court of City and Cnty. of S.F.*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

21. *T.L.O.*, 469 U.S. at 341, 105 S.Ct. 733.

address school seizures.[22] Several appellate courts,[23] including the Third Circuit Court of Appeals, have held that seizures in public schools are valid if reasonable, "giving special consideration to the goals and responsibilities of our public schools," especially with regard to disciplinary matters.[24] A child's age is one of the circumstances to be considered in evaluating the reasonableness of a seizure.[25]

█ Viewing the record in the light most favorable to Hunt, the facts support a finding that he was seized for Fourth Amendment purposes. He was called to the Vice Principal's office and was escorted there by a teacher's aide. Outside the office, Pritchett met Hunt and walked with him into the reading lab. Pritchett was in uniform, carrying a gun, handcuffs, and other indicia of police authority. Pritchett then met with AB and Hunt in the reading lab for close to one hour. For some period of time, the door to the reading lab was closed. Hunt was eight years old. Pritchett never told Hunt that he could leave the reading lab, and Pritchett admitted that he did not expect Hunt to leave. Based on these facts, a reasonable child would not believe he was free to leave the room.

█ The next issue is whether Pritchett's seizure was reasonable. McDowell informed Pritchett that he knew AB had taken the money, and Pritchett stated that he was 99% sure Hunt was not involved in the incident. Neither Pritchett nor any school official contacted Hunt's parents to ask permission to conduct the interrogation. Pritchett has no training on how to question elementary school children, and, according to the State Police contract with the school district, Pritchett was to perform SRO duties only at the high schools. McDowell never asked Pritchett to question Hunt, and Pritchett never requested that permission.

When Pritchett brought Hunt into the reading lab, Pritchett claims to have told Hunt that he knew Hunt did not take the money. If Pritchett knew that Hunt had nothing to do with the incident, his reason for questioning Hunt becomes suspect. One could reasonably infer that Pritchett brought Hunt to the reading lab not to find out whether Hunt was involved in the theft, but to use Hunt to elicit AB's confession. AB could see that Hunt was younger than he, and AB watched as Pritchett intimidated Hunt by threatening arrest, and describing the unpleasant detention facility where Hunt might be housed. When Pritchett achieved his goal, by getting Hunt to start crying, Pritchett shamed AB into confessing. These facts would support a finding that Pritchett's seizure was unreasonable.

█ Having determined that the record supports Hunt's Fourth Amendment claim, the Court must decide whether a child's right to be free from unreasonable seizures while in school is a "clearly established" right, which would defeat Pritchett's qualified immunity.[26] The Supreme

22. See Shuman, 422 F.3d at 147–48.

23. See, e.g., Doe ex rel. Doe v. Haw. Dept. of Educ., 334 F.3d 906, 909 (9th Cir.2003); Milligan v. City of Slidell, 226 F.3d 652, 654–55 (5th Cir.2000); Wallace v. Batavia Sch. Dist. 101, 68 F.3d 1010, 1013–14 (7th Cir.1995); Hassan v. Lubbock Indep. Sch. Dist., 55 F.3d 1075, 1079 (5th Cir.1995); Edwards ex rel. Edwards v. Rees, 883 F.2d 882, 884 (10th Cir.1989).

24. See Shuman, 422 F.3d at 148.

25. J.D.B. v. N.C., —— U.S. ——, ——, 131 S.Ct. 2394, 2399, 180 L.Ed.2d 310 (2011).

26. Under Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), the Court need not decide whether there is a violation of a constitutional right, if the right is not clearly established. In this appeal,

Court decision in *T.L.O,* followed by the Third Circuit Court of Appeals decision in *Shuman v. Penn Manor School District,*[27] establishes that unreasonable seizures of school children violate their Fourth Amendment rights. But there remains a question as to whether Pritchett should have known that his conduct was impermissible.

Pritchett's purpose in detaining Hunt bears on the analysis. In *Shuman,* for example, the assistant principal was investigating an incident of sexual misconduct, and required Shuman, one of the participants, to stay in a small conference room for four hours, while others were interviewed. Shuman did school work, and was taken to the cafeteria for lunch, but he was not free to leave the room on his own. The court found the detention reasonable, holding that, "[i]n light of the serious nature of [the other participant's] accusations, or at a minimum, the misconduct which Shuman admitted to, it was reasonable for the school to detain Shuman to investigate this behavior."[28] In *Gray v. Bostic,* by contrast, the court held that an SRO's conduct—handcuffing a nine-year-old for five minutes—"for the sole purpose of punishing her was an obvious violation of [the child's] Fourth Amendment rights."[29]

Pritchett's purpose in interrogating Hunt is disputed. Pritchett stated that he interviewed Hunt to follow up on AB's claim that Hunt took the money. But Pritchett also said that, before the inter-

view, he told Hunt not to be concerned because Pritchett knew that Hunt was not involved. On a motion for summary judgment all facts and inferences are considered in the light most favorable to Hunt. Under this standard, as noted above, one could find that Pritchett was interrogating Hunt for the purpose of scaring him, so that AB would be shamed into confessing. Pritchett should have known that it was unreasonable to seize Hunt and intentionally frighten him, in order to teach another student a lesson.

### Tort Claims [30]

### I. Intentional Infliction of Emotional Distress

▮▮▮▮▮ A claim for intentional infliction of emotional distress (IIED) requires proof that Pritchett intentionally engaged in extreme or outrageous conduct that caused severe emotional distress.[31] Outrageous behavior is "conduct that exceeds the bounds of decency and is regarded as intolerable in a civilized community."[32] "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery[.]"[33] If reasonable minds may differ, the question of whether the conduct is extreme and outrageous is for the jury.

Comment (e) to Section 46 of the Restatement (Second) of Torts addresses the circumstances of this case:

however, the order of the analysis is irrelevant.

27. 422 F.3d 141, 148 (3d Cir.2005).

28. *Shuman,* 422 F.3d at 149.

29. *Gray ex rel. Alexander v. Bostic,* 458 F.3d 1295, 1307 (11th Cir.2006).

30. Pritchett acknowledges that intentional tort claims are not barred by the State Tort Claims Act, 10 *Del. C.* § 4001.

31. *Goode v. Bayhealth Med. Ctr., Inc.,* 2007 WL 2050761, at *2 (Del.Supr.).

32. *Ibid.* (citation omitted).

33. RESTATEMENT (SECOND) OF TORTS § 46(h) (1965).

The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.... In particular, police officers [and] school authorities ... have been held liable for extreme abuse of their position. Even in such cases, however, the actor has not been held liable for mere insults, indignities, or annoyances that are not extreme or outrageous.

One of the Restatement's illustrations is instructive:

A, the principal of a high school, summons B, a schoolgirl, to his office, and abruptly accuses her of immoral conduct with various men. A bullies B for an hour, and threatens her with prison and public disgrace for herself and her parents unless she confesses.[34]

■ In some respects, Pritchett's conduct was less outrageous than that of the principal in the illustration. Pritchett never threatened Hunt with public disgrace, and the alleged conduct in the illustration is far more serious. On the other hand, the illustration involves a high school student being threatened by a school official. Here, an eight year old was threatened by a uniformed police officer. Viewing the facts in the light most favorable to Hunt, we are satisfied that reasonable minds could differ as to whether Pritchett's conduct was extreme and outrageous.

■ The record on Hunt's emotional distress is sparse. The only indication that he suffered severe distress is the fact that he withdrew from the school and was home schooled for the remainder of the year. If there is nothing more to support Hunt's claim, it is unlikely that a jury will decide that he is entitled to relief. At this stage, however, there is some evidence from which one can infer that Hunt was so distressed that he could not return to school. Accordingly, the motion for summary judgment should have been denied.

## II. False Imprisonment/False Arrest

■ "[T]he tort of false arrest differs from the tort of false imprisonment only in terminology."[35] The elements of a claim for false imprisonment are: "(a) [a] restraint which is both (b) unlawful and (c) against one's will."[36] "The restraint may be accomplished by physical force, by threats of force or intimidation or by assertion of legal authority."[37] "False imprisonment or false arrest is generally defined as the deprivation of the liberty of another without his consent and without legal justification. Legal justification is held to be the equivalent of legal authority and judged by the principles applicable to the law of arrest."[38] For the same reasons discussed in connection with the § 1983 claim, the false arrest claim survives the motion for summary judgment.

## III. Battery

■ The tort of battery is "the intentional, unpermitted contact upon the person of another which is harmful or of-

---

**34.** RESTATEMENT (SECOND) OF TORTS § 46(e), illus. 6 (1965).

**35.** *Tyburski v. Groome*, 1980 WL 333070, at *6 (Del.Super.) (citations omitted).

**36.** *See Harrison v. Figueroa*, 1985 WL 552279, at *2 (Del.Super.).

**37.** *Tyburski*, 1980 WL 333070, at *6 (citation omitted).

**38.** *Ibid.* (citation omitted).

fensive." [39] "The intent necessary for battery is the intent to make contact with the person, not the intent to cause harm." [40] "[F]or bodily contact to be offensive, it must offend a reasonable sense of personal dignity." [41] "The fact that a person does not discover the offensive nature of the contact until after the event does not, *ipso facto*, preclude recovery." [42]

 Hunt's battery claim is not supported by the record. Pritchett says that he tapped the back of Hunt's hand to show that the only consequences of his behavior would be a "slap on the wrist." According to Pritchett, Hunt laughed. Hunt did not remember ever being touched by Pritchett, and nothing in the record suggests that Hunt was harmed or that he found the alleged contact objectionable. Thus, the trial court correctly entered judgment in favor of Pritchett on the battery claim.

### Conclusion

Based on the foregoing, the judgment of the Superior Court is affirmed in part and reversed in part. This matter is remanded to the Superior Court for further action in accordance with this opinion. Jurisdiction is not retained.

---

**39.** *Brzoska v. Olson*, 668 A.2d 1355, 1360 (Del.1995).

**40.** *Ibid.* (citation omitted).

**41.** *Ibid.* (citing RESTATEMENT (SECOND) OF TORTS § 19 (1965)) (italics removed).

**42.** *Ibid.* (citing RESTATEMENT (SECOND) OF TORTS § 18 cmt. d (1965)).