IN THE SUPREME COURT OF THE STATE OF DELAWARE

<table>
<tr><td>IN RE COVID-RELATED RESTRICTIONS ON RELIGIOUS SERVICES</td><td>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§</td><td>No. 354, 2023<br><br>Courts Below: Court of<br>Chancery of the State of Delaware<br>C.A. No. 2021-1036<br><br>Superior Court<br>of the State of Delaware<br>C.A. No. N23C-01-123</td></tr>
</table>

Submitted: May 22, 2024
Decided: August 1, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery and the Superior Court of the State of Delaware. **AFFIRMED**.

Stephen J. Neuberger, Esquire (*argued*), Thomas S. Neuberger, Esquire, THE NEUBERGER FIRM, P.A., Wilmington, Delaware, Thomas C. Crumplar, Esquire, JACOBS & CRUMPLAR, P.A., Wilmington, Delaware, *for Appellants Pastor Alan Hines and Reverend David W. Landow.*

Zi-Xiang Shen, Esquire, Esquire, Zachary S. Stirparo, Esquire (*argued*), STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee, Governor John Carney.*

**LEGROW**, Justice:

In the early days of a global pandemic, the Governor of Delaware utilized his powers under the State's emergency management act to impose restrictions on individuals and businesses with the intent of protecting public health and slowing the spread of the virus. Some of those restrictions, although neutrally focused, had the effect of limiting how people observed and practiced their religions, while other restrictions were specifically focused on the activities of "houses of worship." The restrictions on religious worship became the subject of litigation and are the focus of this appeal.

All the challenged restrictions were lifted by June 2020. More than 18 months later, the appellants filed suit in the Court of Chancery, seeking injunctive relief against restrictions that no longer were in effect. The Court of Chancery dismissed that action because it concluded that it lacked subject matter jurisdiction over the dispute. The appellants then transferred their action to the Superior Court, seeking declaratory judgment and damages regarding the past restrictions on their constitutional religious rights. The Superior Court also dismissed that action, concluding that the appellants' claims for declaratory relief were not justiciable and that the Governor was immune from suit for the damages claims.

The appellants have challenged the dismissal of their claims by both courts. The appellants—two religious leaders—advance passionate arguments regarding the essential nature of religious freedom in this State and this country. We agree that

freedom of religion is an essential tenet of our democracy and that restrictions on religious worship must be viewed with a great deal of skepticism. On the other hand, the judiciary is not the forum to debate and resolve hypothetical questions regarding the constitutionality of restrictions that were lifted long before any legal action was filed. Moreover, public officials who act under emergent conditions and make careful, discretionary decisions based on the best information available are immune from personal liability if those actions are later determined to be contrary to the law. For those reasons, we agree with our trial courts that the appellants' claims could not proceed. We therefore affirm the decisions challenged on appeal.

## I.       RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[1]

## A.    COVID-19 Pandemic

In January 2020, public health officials in China identified a novel coronavirus that later came to be known as the SARS CoV-2 virus ("COVID-19").[2] On March 11, 2020, the World Health Organization declared the spread of COVID-19 a global pandemic.[3] In the days and weeks that followed, the COVID-19 virus

---

[1] Unless otherwise noted, the recited facts are taken from the Superior Court's August 28, 2023, Opinion and the Court of Chancery's November 21, 2022, Opinion. *See In re COVID-Related Restrictions on Religious Services*, 302 A.3d 464 (Del. Super. 2023) (hereinafter "Superior Court Opinion at __."); *In re COVID-Related Restrictions on Religious Services*, 285 A.3d 1205 (Del. Ch. 2022) (hereinafter "Chancery Opinion at __.").

[2] Superior Court Opinion at 472.

[3] Chancery Opinion at 1211; Superior Court Opinion at 472–73.

began spreading rapidly across the United States.[4]  Federal, state, and local authorities enacted various mandates and guidelines in an attempt to address the ensuing public health crisis.

### 1.    The State of Emergency

On March 13, 2020, Governor John C. Carney Jr. (the "Governor") issued a "Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat" (the "Emergency Declaration").[5]  The Emergency Declaration stated that it would remain in effect "until terminated as provided under state law."[6]  The Emergency Declaration recommended social distancing and the cancellation of "non-essential mass gatherings" of one hundred people or more, and addressed the operation of schools and senior care facilities, but did not otherwise prescribe specific rules for businesses or gatherings of fewer than one hundred people.[7]  The Governor issued the Emergency Declaration in accordance with powers granted to him under Title 20, Chapter 31 of the Delaware Code (the "Emergency Management Act").[8]

---

[4] Superior Court Opinion at 472.

[5] App. to Appellee's Answering Br. at B1–4.

[6] *Id.* at B1.

[7] *Id.* at B1–4.

[8] *Id.* at B1.

## 2. The Governor's Authority Under the Emergency Management Act

The Emergency Management Act provides that the Governor is "responsible for addressing the dangers to life, health, environment, property or public peace within the State presented by emergencies or disasters . . . ."[9] The Emergency Management Act further provides that "the Governor may issue, amend and rescind all necessary executive orders, emergency orders, proclamations and regulations, which shall have the force and effect of law."[10] Section 3115(c) of the Emergency Management Act grants the Governor the power to proclaim a state of emergency. It provides:

> In addition to the powers conferred upon the Governor by this chapter, a state of emergency may be proclaimed by emergency order of the Governor upon a finding that an emergency or disaster has occurred or that such occurrence or threat of that occurrence is imminent. The state of emergency shall continue until the Governor finds that the threat or danger has passed or the emergency or disaster has been dealt with to the extent that conditions necessitating a state of emergency no longer exist and terminates the state of emergency by subsequent order. No state of emergency can continue for more than 30 days without being renewed by the Governor.[11]

---

[9] 20 *Del. C.* § 3115(a).

[10] 20 *Del. C.* § 3115(b).

[11] 20 *Del. C.* § 3115(c).

4

Additionally, the Emergency Management Act permits the Governor to "[t]ake such other actions as the Governor reasonably believes necessary to help maintain life, health, property, or public peace."[12]

## B. The Pre-May 15th Orders and Actions

As the COVID-19 pandemic worsened, and in conjunction with updates to guidance from public health authorities, the Governor issued a series of modifications to the Emergency Declaration.[13]

### 1. The Fourth Modification

On March 22, 2020, the Governor issued the "Fourth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat" (the "Fourth Modification").[14] The Fourth Modification categorized certain "businesses, establishments, and enterprises . . . as 'Essential Businesses' and 'Non-Essential Businesses.'"[15] Essential Businesses could remain open; Non-Essential Businesses had to close their physical locations.[16]

Under the Fourth Modification, "[h]ouses of worship and other place[s] of religious expression or fellowship" (collectively, "Houses of Workship") were

---

[12] 20 *Del. C.* § 3116(b)(13).

[13] This Opinion does not include every modification to the Emergency Declaration but only those pertinent to this appeal.

[14] App. to Appellee's Opening Br. at A210–27.

[15] *Id.*

[16] *Id.* at A226–27.

deemed Essential Businesses and could remain open.[17] The Fourth Modification went on to state that Houses of Worship were "subject to the requirements of existing emergency orders, which requirements are not affected by this Order."[18] Included in "existing emergency orders" was the "Second Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat" (the "Second Modification").[19] The Second Modification mandated that "organizers and sponsors of public gatherings of 50 or more people shall cancel the gatherings immediately and not reschedule them until after May 15, 2020, or the public health threat of COVID-19 has been eliminated."[20]

The Fourth Modification included a list of mandates and restrictions, titled "Responsibilities of Essential Businesses," which included adherence to the guidance set forth on flexible sick-leave policies, social distancing, cleaning, and sanitizing.[21] The Fourth Modification stated that it had "the force and effect of law," and that "[a]ny failure to comply with [its] provisions . . . constitutes a criminal offense."[22]

---

[17] *Id.* at A225.

[18] *Id.* at A225.

[19] App. to Appellee's Answering Br. at B5–9.

[20] *Id.* at B6.

[21] App. to Appellee's Opening Br. at A213.

[22] *Id.* at A227.

## 2. The Ninth Modification

On April 1, 2020, the Governor issued the "Ninth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat" (the "Ninth Modification").[23] The Ninth Modification reduced the number of people permitted to gather from fifty to ten "until after May 15, 2020 or the public health threat of COVID-19 has been eliminated."[24] The Ninth Modification contained an exception for "gatherings of employees engaged in work at [E]ssential [B]usinesses," which were "not prohibited by th[e] Ninth Modification . . . but remain subject to requirements for hand hygiene and social distancing."[25]

The Ninth Modification expanded the Responsibilities of Essential Businesses.[26] The additional mandates included: allowing no more than 20% of stated fire occupancy requirements in the building at one time and no more than 10% during exclusive hours for high-risk populations; clearly marking six-foot spacing in checkout lines and in high-traffic areas of stores; discontinuing self-serve foods and product sampling; and designating staff to count the number of customers in the store and enforce social distancing and guidelines set by the CDC.[27]

---

[23] *Id.* at A234–40.

[24] *Id.* at A237.

[25] *Id.*

[26] *Id.* at A238.

[27] *Id.*

### 3. The Tenth Modification

On April 6, 2020, the Governor issued the "Tenth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat" (the "Tenth Modification").[28] The Tenth Modification modified language in the Fourth Modification regarding Houses of Worship.[29] Houses of Worship were now ordered to "comply with all social distancing requirements set forth in the COVID-19 State of Emergency declaration and all modifications, including attendance of no more than 10 people for in-person services under any circumstances" (the "Ten-Person Restriction").[30] The Tenth Modification "strongly encouraged [Houses of Worship] to transition any in-person services to remote services broadcast by telephone or video."[31]

Of the 237 categories of Essential Businesses identified by the State of Delaware, only Houses of Worship were subject to the Ten-Person Restriction.[32] The categories of "Social Advocacy Organizations" and "Business, Professional, Labor, Political, and Similar Organizations" were designated as Essential Businesses in the same industry subsector as religious groups, but were not required to comply

---

[28] *Id.* at A242–54.

[29] *Id.* at A247.

[30] *Id.*

[31] *Id.*

[32] *Id.* at A242–54.

with the Ten-Person Restriction.[33]  Other organizations deemed Essential Businesses were only subject to the 20% restriction[34] within the same industry subsector.[35]

The only other category of Essential Businesses that faced a special limitation comparable to Houses of Worship were "Restaurants and Other Eating Places."[36] These businesses were only permitted to provide takeout and delivery.[37]

### 4.  Guidance on Worship Services

On April 7, 2020, a day after the Governor issued the Tenth Modification, the Delaware Division of Public Health issued "Guidance on Worship Services" (the "April Worship Guidance").[38]  The April Worship Guidance imposed additional mandates and restrictions on Houses of Worship.  Some of these additional restrictions included: whenever possible, conducting activities from home through remote audio or video services; limited in-person services with no physical interaction with "clergy, staff, or other participants" including, but not limited to, "collecting donations by basket or plate"; adherence to social distancing; four-hour

---

[33] *Id.* at A232.

[34] Under the 20% restriction, Essential Businesses could allow no more than 20% of the permitted fire occupancy of their premises at any one time, and during exclusive hours for high-risk populations (including seniors) could allow no more than 10% of the permitted fire occupancy of their premises at any one time.

[35] Chancery Opinion at 1214–15.

[36] App. to Appellee's Opening Br. at A231.

[37] *Id.*

[38] *Id.* at A206–08.

9

gaps between in-person services; additional cleaning and disinfection guidance; and a series of rules relating to drive-in services.[39]

## C.     May 15 Press Conference

"On May 15, 2020, the Governor held a press conference during which he addressed concerns about the 'need for churches to be reopened.'"[40] The Governor's full remarks were as follows:

> One of the things we need to make clear is that we never as an essential function, as a constitutional right, we never did close churches and places of worship in the first place, we just limited public gatherings to ten or fewer, which effectively for many of those places of worship meant that there wasn't a way for them [to] stay open.[41]

With respect to the Governor's remarks at the May 15 press conference, the Court of Chancery stated that:

> The Governor did not close Houses of Worship, as he closed Non-Essential Businesses. Nevertheless, because the Governor made Houses of Worship subject to the Ten-Person Requirement, many of them as a practical matter could not open. For those Houses of Worship, the Ten-Person Requirement operated as a *de facto* prohibition on opening.[42]

---

[39] *Id.*

[40] Chancery Opinion at 1215–16.

[41] *Id.* at 1216.

[42] *Id.*

**D.      The Eighteenth Modification and Revised Guidance on Worship Services**

On May 18, 2020, the Governor issued the "Eighteenth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat" (the "Eighteenth Modification").[43]  The Eighteenth Modification stated that "in-person worship can be safely resumed with appropriate precautions to protect health of worshipers and the public."[44]  Although the Eighteenth Modification permitted in-person worship to resume, it provided that Houses of Worship could either hold: (1) "in-person services and gatherings of 10 or fewer people"; or (2) "in-person services and gatherings" of up to 30% capacity only if all attendees observed CDC social-distancing guidelines.[45]

On the same day, the Division of Public Health issued revised guidance for communities of worship (the "May Worship Guidance").[46]  The May Worship Guidance included four pages of restrictions and requirements on Houses of Worship.  These restrictions included the prohibition of: communion, baptism, worship over 60 minutes, preachers without masks, and services on six out of seven days each week.[47]  These requirements included: the posting of signage regarding

---

[43] App. to Appellee's Opening Br. at A309–14.

[44] *Id.* at A313.

[45] *Id.* at A314.

[46] *Id.* at A316–19.

[47] *Id.*

11

who may enter, masking requirements, and social distancing requirements; requirements on cleaning and sanitization; and recommendations regarding the preparation and distribution of materials.[48] Although the Governor banned touching for baptisms, he issued no such restrictions on Jewish circumcisions.[49]

**E.     The Bullock Action, Nineteenth Modification, Phase 1 Reopening Plan, and Additional Guidance on Worship Services**

On May 19, 2020, Reverend Dr. Christopher Bullock filed a lawsuit against the Governor in the United States District Court for the District of Delaware (respectively, the "Bullock Action" and the "District Court").[50] Bullock asserted that the Emergency Declaration, April Worship Guidance, and May Worship Guidance violated his rights under the Free Exercise, Establishment, and Equal Protection Clauses of the United States Constitution.[51] Bullock sought injunctive relief, including a temporary restraining order ("TRO").[52]

On May 22, 2020, the Governor issued the "Nineteenth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat" (the "Nineteenth Modification").[53] Effective June 1, 2020, the Nineteenth

---

[48] *Id.*

[49] *See id.*

[50] App. to Appellee's Answering Br. at B10–40.

[51] *Id.*

[52] *Id.* at B37.

[53] App. to Appellee's Opening Br. at A325–40.

Modification eliminated the "Essential" versus "Non-Essential" categorization of businesses and replaced it with industry-specific guidance set forth by the Governor in the Delaware Phase 1 Reopening Plan.[54] Under the Phase 1 Reopening Plan, Houses of Worship could operate at 30% of their permitted fire occupancy.[55] On the same day, the Division of Public Health issued updated Worship Guidance (the "Reopening Worship Guidance").[56] Under the Reopening Worship Guidance, in-person youth events, education, and support groups were permitted but limited to ten persons per group.[57] The Reopening Worship Guidance eliminated the rule restricting religious services to less than one hour, expanded the circumstances in which an individual did not need to wear a face covering, modified the signage requirements, and continued to regulate the methods for preparing and distributing consecrated or blessed food or drink.[58] Under the Reopening Worship Guidance it remained true that an officiant could not physically hold a candidate for baptism."[59]

---

[54] *Id.*; App. to Appellee's Answering Br. at B60–87.

[55] App. to Appellee's Answering Br. at B82.

[56] App. to Appellee's Opening Br. at A342–46.

[57] *Id.*

[58] *Id.*

[59] *Id.*

13

On May 28, 2020, the District Court heard oral argument and denied Bullock's motion for a TRO.[60] The District Court held that the relief Bullock requested was more restrictive to Houses of Worship than the current guidance under the Reopening Worship Guidance and concluded that Bullock had not established a threat of "irreparable harm" required to grant a TRO.[61] The United States Court of Appeals for the Third Circuit affirmed the denial of the TRO.[62]

## F.    The Twentieth and Twenty-First Modifications

On May 31, 2020, the Governor issued the "Twentieth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat" (the "Twentieth Modification").[63] The Twentieth Modification eliminated the restrictions applicable to Houses of Worship set forth in the Eighteenth Modification and provided that the 30% capacity limit remained in effect for Houses of Worship and other Essential Businesses.[64]

On June 14, 2020, the Governor issued the "Twenty-First Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health

---

[60] *Id.* at A37–143; *Bullock v. Carney*, 463 F. Supp. 3d 519, 525 (D. Del. 2020), *aff'd*, 806 F. App'x 157 (3d Cir. 2020), and *aff'd*, 2020 WL 7038527 (3d Cir. June 4, 2020).

[61] App. to Appellee's Opening Br. at A342–346; *Bullock*, 463 F. Supp. 3d at 525.

[62] *Bullock v. Carney*, 806 Fed. App'x 157 (3d Cir. 2020), *amended and superseded* by *Bullock v. Carney*, 2020 WL 7038527 (3d Cir. June 4, 2020).

[63] App. to Appellee's Answering Br. at B41–56.

[64] *Id.*

Threat" (the "Twenty-First Modification").[65]    The Twenty-First Modification increased the capacity limit for Essential Businesses, including Houses of Worship, to 60%.[66]

## G.    The Bullock Settlement

On November 10, 2020, the parties to the Bullock Action—Bullock and the State—reached a settlement after court-ordered mediation (the "Settlement Agreement").[67]  Under the terms of the Settlement Agreement, the Governor agreed "not to impose restrictions that specifically target [H]ouses of [W]orship,"[68] including but not limited to restricting gatherings in Houses of Worship to ten persons.[69]  The Governor "reserve[d] the right to impose or maintain neutral rules of general applicability" and agreed to pay $157,200 "for the benefit of" Reverend Bullock and his counsel.[70]  The parties stipulated that the Settlement Agreement did not constitute "an admission or acknowledgement of guilt, wrongdoing, liability, or financial responsibility whatsoever on the part of the Governor, including any former or present employees or agents of the Governor."[71]

---

[65] *Id.* at B88–106.

[66] *Id.*

[67] Chancery Opinion at 1221; Superior Court Opinion at 476–77.

[68] App. to Appellee's Opening Br. at A562.

[69] Superior Court Opinion at 476–77.

[70] Chancery Opinion at 1221–22; App. to Appellee's Opening Br. at A483.

[71] Chancery Opinion at 1222.

**H.      State of Emergency Lifted**

On July 13, 2021, the Governor ended the State of Emergency and terminated all restrictions imposed by the Emergency Declaration, including all its modifications.[72]

**I.      The Court of Chancery Action**

On December 1, 2021, Pastor Alan Hines of the Townsend Free Will Baptist Church and Reverend David W. Landow of Emmanuel Orthodox Presbyterian Church filed separate complaints in the Court of Chancery.[73]  The Court of Chancery consolidated the actions, and Hines and Landow (collectively, "Plaintiffs" or "Appellants") filed a consolidated amended complaint challenging restrictions that the Governor imposed on Houses of Worship during the early days of the COVID-19 pandemic (the "Challenged Restrictions").[74]

As the Court of Chancery accurately recounted, "[t]he Challenged Restrictions evolved over time.  Initially, they were quite strict, reflecting the profound threat that COVID-19 posed in early 2020.  As the state of scientific knowledge progressed, and particularly after the arrival of vaccines, the Governor

---

[72] *Id.*; Superior Court Opinion at 477.

[73] Chancery Opinion at 1222; Superior Court Opinion at 477; App. to Appellee's Opening Br. at A1–4.

[74] Chancery Opinion at 1222; App. to Appellee's Opening Br. at A1–4; App. to Appellee's Answering Br. at B167–282.

relaxed the Challenged Restrictions."[75] Although all the Challenged Restrictions had been lifted entirely by the time Plaintiffs filed their initial complaint, Plaintiffs sought broad equitable relief and declaratory judgments regarding the Challenged Restrictions. Specifically, in the consolidated amended complaint Plaintiffs sought the following remedies: (1) a declaratory judgment regarding the constitutionality of the Challenged Restrictions, (2) a permanent injunction against the Governor and his successors to prevent them from enacting similar restrictions in the future, and (3) nominal and compensatory damages.[76]

On November 21, 2022, the Court of Chancery dismissed Plaintiffs' consolidated complaint for lack of subject matter jurisdiction.[77] Significant to the court's analysis was the fact that all the Challenged Restrictions had been lifted by June 2, 2020, more than a year before Plaintiffs initiated the Chancery actions.[78] The Court of Chancery found that "the plaintiffs cannot meet the operative standard" of demonstrating "a reasonable apprehension that the Governor would engage in conduct that would warrant a permanent injunction."[79]

---

[75] Chancery Opinion at 1209.

[76] App. to Appellee's Answering Br. at B167–282.

[77] Chancery Opinion at 1235.

[78] App. to Appellee's Answering Br. at B167–282.

[79] Chancery Opinion at 1233, 1235.

## J. Superior Court Action

On January 24, 2023, Plaintiffs transferred their action to the Superior Court pursuant to 10 *Del. C.* § 1902 and filed the operative complaint.[80] Plaintiffs alleged violations of their constitutional rights under: Article I, Section 1 of the Delaware Constitution; the Free Exercise Clause of the First Amendment of the United States Constitution; the Free Speech, Free Exercise, Free Assembly, and Free Association Clauses of the First Amendment of the United States Constitution; the Establishment Clause of the First Amendment of the United States Constitution; and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.[81] Plaintiffs requested nominal and compensatory damages and a declaratory judgment.[82]

On April 14, 2023, Defendant moved to dismiss Plaintiffs' claims in their entirety.[83] The Superior Court granted those motions.[84] The court dismissed the claims for nominal and compensatory damages under the U.S. and Delaware Constitutions on the basis of the qualified immunity doctrine and the State Tort Claims Act, respectively.[85] The Superior Court dismissed the declaratory judgment

---

[80] Superior Court Opinion at 477; App. to Appellee's Opening Br. at A20–29.

[81] Superior Court Opinion at 477.

[82] *Id.* at 478.

[83] *Id.*

[84] *Id.* at 498.

[85] *Id.*

18

claims on the basis that they were not justiciable because Plaintiffs failed to establish (i) the existence of a current case or controversy; and (ii) that declaratory relief could redress the harm they allegedly suffered.[86]

On appeal, Appellants challenge the holdings of the Court of Chancery and the Superior Court. Appellants argue that: (i) there is no adequate remedy at law for their irreparable injuries and the Court of Chancery therefore erred in concluding that it lacked subject matter jurisdiction; (ii) the Governor does not have discretion to exercise a power expressly forbidden to him by the Delaware Constitution and the Superior Court's holdings with respect to justiciability accordingly should be reversed; and (ii) the Governor does not have qualified immunity and therefore the Superior Court's holdings on the State Tort Claims Act and qualified immunity constituted reversible error.

---

[86] *Id.*

## II.  STANDARD OF REVIEW

We review questions of law *de novo*, including issues relating to subject matter jurisdiction,[87] justiciability,[88] standing,[89] and constitutional questions.[90]

## III.  ANALYSIS

### A.  The Court of Chancery correctly dismissed Appellants' claim for lack of subject matter jurisdiction.

On November 21, 2022, the Court of Chancery dismissed Appellants' consolidated complaint for lack of subject matter jurisdiction.[91]  In the Chancery proceedings, Appellants argued that:

> they have a reasonable apprehension that the Governor will re-impose restrictions on worship comparable to the Challenged Restrictions because (1) the COVID-19 pandemic is not over, (2) the Governor continues to maintain that he never violated the plaintiffs' constitutional rights by imposing the Challenged Restrictions, (3) the Governor has not issued a sworn statement averring that he will not impose similar policies affecting religious worship in the future, and (4) there is no mechanism to prevent the Governor from re-implementing similar restrictions.[92]

---

[87] *Imbragulio v. Unemployment Ins. Appeals Bd.*, 223 A.3d 875, 878 (Del. 2019) (citing *Linn v. Delaware Child Support Enf't*, 736 A.2d 954, 959 (Del. 1999)).

[88] *Crescent/Mach I Partners, L.P. v. Dr Pepper Bottling Co. of Texas*, 962 A.2d 205, 208 (Del. 2008); *see Candlewood Timber Group, LLC v. Pan Am. Energy*, LLC, 859 A.2d 989, 997 (Del. 2004) (subject matter jurisdiction reviewed *de novo*); *see also Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008) (all justiciability issues are reviewed *de novo*).

[89] *Albence v. Higgin*, 295 A.3d 1065, 1085 (Del. 2022); *Rosenbloom v. Esso Virgin Islands, Inc.*, 776 A.2d 451, 458 (Del. 2000).

[90] *City of Wilm. v. Nationwide Ins. Co.*, 154 A.3d 1124, 1127 (Del. 2017); *Clark v. Clark*, 47 A.3d 513, 517 (Del. 2012).

[91] Chancery Opinion at 1235.

[92] *Id.* at 1233–34.

The Court of Chancery held that "[v]iewed individually or collectively, these concerns are not sufficient to support equitable jurisdiction."[93] The court went on to reason that "[a]lthough it is true that the virus continues to circulate and mutate, the possibility of a future surge, much less one that will necessitate emergency measures on par with what the world experienced in the first half of 2020, is speculative at best."[94] The Court of Chancery found that "the plaintiffs cannot meet the operative standard" of demonstrating "a reasonable apprehension that the Governor would engage in conduct that would warrant a permanent injunction."[95]

Appellants raise a wide-ranging series of alleged errors on appeal. They contend that the Court of Chancery erred in finding that there is an adequate remedy at law for the irreparable injuries they suffered.[96] They argue that the threat of "future irreparable injury [] exists because of the amount of time it will take to seek emergency injunctive relief the next time the Governor and his successors shut down and otherwise interfere with religious worship in violation of Article I, § 1."[97] Appellants argue that "the more time it takes, the greater the irreparable injury to the

---

[93] *Id.* at 1234.

[94] *Id.*

[95] *Id.* at 1233, 1235.

[96] Appellants' Opening Br. at 55.

[97] *Id.* at 56.

21

pastor's religious worship and other religious constitutional rights."[98]  Further, Appellants contend that the Court of Chancery's ruling that there was no reasonable apprehension of the Governor reimposing his policies in the future sufficient to establish equity jurisdiction, "was the functional equivalent of a merits ruling on the disputed defense motion that the case was moot, but without any consideration of the fully briefed legal questions of whether this Court's exceptions to the mootness doctrine were met, and the merits test also."[99]  Finally, Appellants argue that the Bullock settlement agreement did not address the protection of Article I, § 1 or the Establishment Clause but only the protections of the Free Exercise Clause.[100]

The Governor ("Appellee") responds that the Court of Chancery correctly held that Appellants had an adequate remedy at law.[101]  Appellee argues that Appellants "ignore the Court of Chancery's conclusion that their failure to seek a preliminary injunction to prevent the Governor from acting in 2022 evidences that they could wait until a final adjudication by a court of law in the form of declaratory

---

[98] *Id.* at 58.

[99] *Id.* at 59.

[100] *Id.* at 60.  Appellants contend that they are not adequately protected by the Bullock Settlement because "we have no consent decree, no binding judicial ruling on the merits, no action by the legislature cancelling his authority, no sworn statement denying in a future emergency the right to affect Sunday worship, and no settlement agreement granting third party rights to enforcement." *Id.*

[101] Appellee's Answering Br. at 43–49.

22

judgment."[102] Further, Appellee points out that the Bullock action directly belies the notion that it will take a church pastor a lengthy amount of time to file an action. Appellee also disputes Appellants' contention that the Governor treated the Court of Chancery's ruling as resolving the question of mootness. Instead, Appellee asserts that "[t]he Governor argued—and the Superior Court agreed—that the mootness doctrine is inapplicable because the controversy was never ripe to begin with."[103]

The first issue that this Court must address on appeal is whether the Court of Chancery erred in dismissing the complaint for lack of subject matter jurisdiction. The Court of Chancery is a court of limited jurisdiction and

> [a]s Delaware's Constitutional court of equity, the Court of Chancery can acquire subject matter jurisdiction over a cause in only three ways, namely, if: (1) one or more of the plaintiff's claims for relief is equitable in character, (2) the plaintiff requests relief that is equitable in nature, or (3) subject matter jurisdiction is conferred by statute.[104]

In the present case, Appellants "ground the existence of equitable jurisdiction on their request for a permanent injunction."[105]

As this Court stated in *North River Insurance Company v. Mine Safety Appliances Company*, "[t]o succeed in a request for a permanent injunction, a party must show (i) actual success on the merits; (ii) that it would suffer irreparable harm

---

[102] *Id.* at 45.

[103] *Id.* at 47.

[104] *Candlewood Timber*, 859 A.2d at 997 (internal citations omitted).

[105] Chancery Opinion at 1224.

if the injunction is not granted; and (iii) that the balance of the equities favors it."[106] Subsumed within the second element is the statutory command that the Court of Chancery lacks jurisdiction to hear a matter where there is a sufficient remedy at law for the alleged harm.[107]

On July 13, 2021, the Governor ended the State of Emergency and terminated all restrictions imposed by the Emergency Declaration, including all its modifications.[108] Appellants filed their Court of Chancery complaints on December 1, 2021.[109] By the time the complaints were filed, the challenged conduct had ceased. Because the Governor had already rescinded the Challenged Restrictions at the time the Court of Chancery issued its decision, the permanent injunctive relief sought was forward looking. "A permanent injunction against future conduct is not warranted simply because a court has found past conduct illegal."[110]

---

[106] 105 A.3d 369, 379 n.47 (Del. 2014) (citing *Christiana Town Ctr., LLC v. New Castle County,* 2003 WL 21314499, at *2 (Del. Ch. June 6, 2003), *aff'd,* 841 A.2d 307 (Del. 2004) (TABLE)).

[107] 10 *Del. C.* § 342 ("The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State.").

[108] Chancery Opinion at 1222; Superior Court Opinion at 477.

[109] Chancery Opinion at 1222; Superior Court Opinion at 477; App. to Appellee's Opening Br. at A1–4.

[110] *Young v. Red Clay Consol. Sch. Dist.*, 2017 WL 2271390, at *53 (Del. Ch. May 24, 2017); *see Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 114–15 (Del. Ch. 2017) ("An injunction against future wrongdoing is not generally available." (citations omitted)).

"For forward-looking relief to be warranted the plaintiff must establish a reasonable apprehension of a future wrong."[111]  That does not mean that a litigant may not seek any legal redress for a past wrong.  But the standard to obtain injunctive relief is higher; to prohibit future action through an injunction, a litigant must show a reasonable apprehension of future wrong in order to establish irreparable harm, which is a threshold for injunctive relief, and thus for subject matter jurisdiction in the Court of Chancery.

Plaintiffs could not demonstrate reasonable apprehension of future conduct. As the Court of Chancery noted below, "[a]lthough it is true that the virus continues to circulate and mutate, the possibility of a future surge, much less one that will necessitate emergency measures on par with what the world experienced in the first half of 2020, is speculative at best."[112]  Appellants do not confront the speculative nature of the future threat they allege, and instead invoke a generalized refrain that any restriction on their religious freedom causes irreparable harm.  This argument, such that it is, does not address the Court of Chancery's analysis or carry Appellants' burden to establish subject matter jurisdiction.  The importance of Appellants' constitutional rights is not disputed, but it also is not dispositive.  The fact remains that, by the time Appellants filed suit, the Challenged Restrictions had been lifted,

---

[111] *Organovo Hldgs.*, 162 A.3d at 114–15 (citations omitted).

[112] Chancery Opinion at 1234.

the Governor had entered into a binding agreement not to impose future restrictions targeting Houses of Worship, and the apprehension of a future pandemic and conditions like those of the early days of the emergency was hypothetical and speculative. This Court "decline[s] to render an advisory opinion on a hypothetical scenario."[113]

Our ruling does not mean that the Governor is free to impose similar restrictions in the future. Rather, we conclude that the Court of Chancery did not err in concluding that Appellants failed to show a reasonable apprehension of future conduct from the Governor that would warrant invoking the jurisdiction of our court of equity.[114]

**B.    The Superior Court correctly held that Appellants' declaratory judgment claim was not justiciable.**

Appellants next challenge the Superior Court's conclusion that the declaratory judgment claims were not justiciable. "In order to adjudicate a matter, a court must have a justiciable controversy before it."[115] Justiciability describes "whether a case

---

[113] *Facer v. Carney*, 277 A.3d 937, 2022 WL 1561444 (Del. 2022) (TABLE), *reargument denied* (June 1, 2022).

[114] The Court of Chancery dismissed the action with leave to transfer under 10 *Del. C.* § 1902. The Governor's conduct did not moot the action, rather it eliminated the equitable hook needed to sustain the jurisdiction of the Court of Chancery.

[115] *Emps. Ins. Co. of Wausau v. First State Orthopaedics, P.A.*, 312 A.3d 597, 606–07 (Del. 2024) (citing *Crescent/Mach 1 Partners, L.P. v. Dr. Pepper Bottling Co. of Texas*, 962 A.2d 205, 208 (Del. 2008) (quoting *Warren v. Moore*, 1994 WL 374333, at *2 (Del. Ch. July 6, 1994))).

is properly suited for resolution by" a court.[116] The four aspects of justiciability are standing, mootness, ripeness, and political question.[117] "Although we refer to the federal courts' interpretation of Article III standing, Delaware courts are not bound by the federal rules of justiciability."[118]

The Superior Court held that Appellants' request for a declaratory judgment was not justiciable for two independent reasons: the complaint failed to establish the existence of a case or controversy, and the plaintiffs failed to establish standing.[119] Appellants waived any claim of error as to the Superior Court's case-or-controversy analysis by failing to meaningfully challenge it on appeal. As to standing, we

---

[116] *Rucho v. Common Cause*, 588 U.S. 684, 691 (2019).

[117] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("The doctrines of mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language, no less than standing does."). *See Bankruptcy Litigation* § 1:2 ("Issues of justiciability can arise, for example, in instances where a matter is not ripe, where an advisory opinion is sought, where a matter is moot, where a party lacks standing, and where the parties in the dispute do not hold adverse interests."); 13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.12 (3d ed.) ("Although discrete names have been given to the several nominate categories of justiciability, they are tied closely together. Standing generates the most excitement, because it focuses directly on the question whether a particular interest or injury is adequate to invoke the protection of judicial decision. Ripeness and mootness easily could be seen as the time dimensions of standing. Each assumes that an asserted injury would be adequate; ripeness then asks whether an injury that has not yet happened is sufficiently likely to happen, and mootness asks whether an injury that has happened is too far beyond a useful remedy. Political-question analysis also is affected by the extent of individual injury.").

[118] *Albence v. Higgin*, 295 A.3d 1065, 1086 (Del. 2022) (citing *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) ("We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability[.]")).

[119] Superior Court Opinion at 492.

27

conclude that the Superior Court correctly held that the harm alleged in the complaint was not redressable through entry of a declaratory judgment.

### 1. Case or Controversy

Before a court may adjudicate a dispute and determine whether relief—including declaratory relief—is warranted, it must have a justiciable controversy before it.[120] The judiciary's power to issue a declaratory judgment "is limited by the well-settled principle that a declaratory judgment must 'address an actual controversy between parties with affected rights.'"[121] In *Rollins Int'l v. Int'l Hydronics Corp.*, we adopted a four-part test to determine whether a case or controversy exists:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; [and] (4) the issue involved in the controversy must be ripe for judicial determination.[122]

The Superior Court applied that test and held that "Plaintiffs have failed to establish an actual case or controversy[.]"[123]

---

[120] *Id.* (citing *Crescent/Mach I Partners*, 962 A.2d at 208) (quoting *Warren*, 1994 WL 374333, at *2)).

[121] *Gower v. Trux, Inc.*, 2022 WL 534204, at *12 (Del. Ch. Feb. 23, 2022) (quoting *Lynch v. Gonzalez*, 2020 WL 5648567, at *6 (Del. Ch. Sept. 22, 2020)).

[122] *Rollins Int'l v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del. 1973).

[123] Superior Court Opinion at 493–95 (citing and quoting *Rollins Int'l*, 303 A.2d at 662–63).

Appellants do not meaningfully address the Superior Court's case-or-controversy analysis, nor do they cite *Rollins* in any of their submissions on appeal. The only time Appellants mention the case-or-controversy requirement in their opening brief is in a single sentence in a section addressing standing. There, Appellants argue that "[t]he interrelated conclusion that Plaintiffs lack standing and there is no case or controversy when their rights under the Delaware Constitution are denied is in error."[124]

The rules of this Court specifically require an appellant to raise and argue claims of error in both the Summary of Argument and the Argument portions of their Opening Brief in order to assure consideration by this Court.[125] Most importantly, Rule 14(b)(vi)(2) provides that "[t]he merits of any argument that is not raised in the body of the opening brief [is] deemed waived and will not be considered by the Court on appeal."[126]

Appellants' passing mention of the case-or-controversy requirement in a section otherwise addressed to standing is not sufficient to raise the merits of the argument. Although Appellants conflate the two doctrines, they are independent

---

[124] Appellants' Opening Br. at 41.

[125] Del. Sup. Ct. R. 14(b)(iv), (vi); *Roca v. E.I. du Pont de Nemours & Co.*, 842 A.2d 1238, 1242 (Del. 2004) (internal quotations and citations omitted) ("It is well established that to assure consideration of an issue by the court, the appellant must both raise it in the Summary of the Argument and pursue it in the Argument portion of the brief.").

[126] Del. Sup. Ct. R. 14(b)(vi)(2).

29

requirements of justiciability, and both must be met.[127]  Nowhere in their opening brief do Appellants either identify or present an argument on the issue of case or controversy in the manner that is required by the Rules of this Court.  "This Court has held that the appealing party's opening brief must fully state the grounds for appeal, as well as the arguments and supporting authorities on each issue or claim of reversible error."[128]  "[C]asual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal."[129]  Accordingly, we hold that Appellants abandoned and waived this issue on appeal, and we therefore affirm the Superior Court's holding that the complaint failed to raise a case or controversy for adjudication.

### 2.    Standing

Although Appellants address standing in their briefs on appeal, they do not directly engage with the Superior Court's redressability analysis and instead insist

---

[127] *First State Orthopaedics*, 312 A.3d at 607 ("The four aspects of justiciability include standing, mootness, ripeness, and political question."); *DaimlerChrysler Corp.*, 547 U.S. at 352 ("The doctrines of mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language, no less than standing does.").

[128] *Roca*, 842 A.2d at 1242 (citing *Turnbull v. Fink, 644 A.2d 1322*, 1324 (Del. 1994)). *See also Willhauck v. Halpin*, 953 F.2d 689, 700 (1st Cir. 1991) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . . . It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . . Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.").

[129] *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993).

that the alleged violations of their constitutional rights necessarily confer standing upon them.[130] At oral argument, Appellants argued that standing exists "because the Constitutional protection is there to protect them" and "by having their religious worship rights stripped away, they suffered injury that gives them standing."[131]

This Court has previously held that:

The term "standing" refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or to redress a grievance. Standing is a threshold question that must be answered by a court affirmatively to ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers.[132]

Further, "[t]he party invoking the jurisdiction of a court bears the burden of establishing the elements of standing."[133] Absent a:

specific statutory grant of review, to establish standing in Delaware, . . . a plaintiff must demonstrate that:

(i) the plaintiff has suffered an 'injury-in-fact,' i.e., a concrete and actual invasion of a legally protected interest;
(ii) there is a causal connection between the injury and the conduct complained of; and
(iii) it is likely the injury will be redressed by a favorable court decision.[134]

---

[130] Appellants' Opening Br. at 41–42.

[131] Oral Argument at 3:50–5:01.

[132] *Dover Hist. Soc. v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

[133] *Id.* at 1109.

[134] *Albence,* 295 A.3d at 1086 (citing *Reeder v. Wagner*, 974 A.2d 858, 2009 WL 1525945, at *2 (Del. 2009) (TABLE)); *O'Neill v. Town of Middletown*, 2006 WL 205071, at *28 (Del. Ch. Jan. 18, 2006) (internal quotations omitted)).

The Superior Court held that a declaratory judgment would not redress Plaintiffs' alleged injuries and that therefore standing was lacking.[135]

Under the standing doctrine's redressability prong, the relief sought must be capable of redressing the plaintiff's injury or grievance.[136] When the challenged conduct has ceased before litigation is filed, redressability can be difficult to demonstrate. We recently discussed redressability in *Emps. Ins. Co. of Wausau v. First State Orthopaedics, P.A.*[137] There, we reversed the Superior Court's holding that the appellee had standing when it sought declaratory judgment regarding a billing code that the appellant stopped using six months before the complaint was filed.[138] We ruled that the appellee's request for declaratory relief did not seek to redress an actual or imminent injury and was only prospective.[139] We explained that "to determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered. Additionally, the plaintiff must show that it is likely, not just speculative, that the requested relief will redress the injury."[140] In *First State Orthopaedics*, we concluded that "a defendant's

---

[135] Superior Court Opinion at 497.

[136] *Albence*, 295 A.3d at 1085.

[137] 312 A.3d 597, 613 (Del. 2024).

[138] *Id.* at 600.

[139] *Id.* at 613.

[140] *Id.* (citing *California v. Texas*, 593 U.S. 659, 671 (2021); *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 904 (Del. 1994)) (internal quotations omitted).

32

voluntary cessation of conduct before litigation begins generally renders a controversy non-justiciable for lack of standing."[141]

Here, the Superior Court correctly held that Appellants' injury could not be redressed through a prospective declaratory judgment. In much the same way that Appellants' irreparable harm argument crumbled because the Challenged Restrictions no longer were in effect and any future action imposing similar restrictions was speculative, the declaratory judgment sought in the Superior Court would not alter the status quo. Moreover, Appellants' constitutional rights would not be restored or further protected by declaratory relief because the complained-of harm had long since ceased and the threat of future harm was speculative.[142]

Appellants' argument on appeal does not address redressability and thus fails to properly address an element of standing. Had they filed their action while the challenged conduct was ongoing, Appellants would have had standing to pursue their claims, subject to mootness considerations if the challenged conduct ceased during the course of the litigation. But Appellants inexplicably waited to pursue their claims and in doing so lost standing under established and binding precedent. Much like in *First State Orthopaedics*, at the time Appellants filed the complaint,

---

[141] *First State Orthopaedics*, 312 A.3d at 600.

[142] Superior Court Opinion at 497.

33

there was no ongoing harm from which a declaratory judgment would provide relief.[143]

## C. The Superior Court correctly concluded that Appellee was immune from Appellants' damages claims for alleged violations of their constitutional rights.

After dismissing Appellants' declaratory judgment claims as nonjusticiable, the Superior Court concluded that the Governor was immune from suit for Appellants' claims seeking monetary damages. Appellants challenge all of the Superior Court's immunity holdings on appeal. As explained below, we affirm those holdings.

### 1. Delaware's State Tort Claims Act.

The Superior Court first held that Plaintiffs' request for damages for alleged violations of their rights under Article 1, Section 1 of the Delaware Constitution was barred by the Delaware State Tort Claims Act ("STCA").[144] Specifically, the Superior Court found as a matter of law "that the Governor is immune from damages pursuant to the STCA for actions taken pursuant to the Emergency Management Act

---

[143] 312 A.3d 597, 613 (Del. 2024).

[144] Superior Court Opinion at 486. On appeal, Appellee argued for the first time that Plaintiffs do not have a private right of action for claims arising under the Delaware Constitution. Appellee's Answering Br. at 11–12. We reject this argument without reaching its merits because it was not raised below. The argument is precluded by Rule 8 of this Court, which provides that arguments not fairly presented to the trial court will not be considered by this Court. Del. Sup. Ct. R. 4.

because those actions were discretionary in nature, and made in good faith without gross or wanton negligence."[145]

The STCA is titled "Limitation on civil liability," and it exempts State employees "from civil liability for acts or omissions taken in their capacity as such . . . ."[146] Under the STCA, "no claim or cause of action shall arise, and no judgment, damages. . . shall be awarded against a public officer or employee. . ." where the official's actions were: (1) discretionary; (2) undertaken in "good faith and in the belief that the public interest would best be served thereby;" and (3) undertaken without gross or wanton negligence.[147] The plaintiff bears the burden of proving the absence of one or more of the elements of immunity in a suit against a state employee for damages.[148]

---

[145] Superior Court Opinion at 489.

[146] *Jackson v. Minner*, 2013 WL 871784, at *5 (Del. Super. Mar. 1, 2013), *aff'd*, 74 A.3d 654 (Del. 2013).

[147] 10 *Del. C.* § 4001. With respect to the first element, the official's actions are discretionary if:

> The act or omission complained of arose out of and in connection with the performance of an official duty requiring a determination of policy, the interpretation or enforcement of statutes, rules or regulations, the granting or withholding of publicly created or regulated entitlement or privilege or any other official duty involving the exercise of discretion on the part of the public officer, employee or member, or anyone over whom the public officer, employee or member shall have supervisory authority.

10 *Del. C.* § 4001.

[148] 10 *Del. C.* § 4001(c).

Appellants did not argue in the Superior Court or on appeal that the Governor's actions were not taken in good faith or that he acted with gross or wanton negligence.[149] Having failed to contest the second and third elements of the STCA, Appellants are left to argue that the Governor's acts were ministerial. But even on this element, Appellants do not directly contest the point. Instead, Appellants contend that the Governor did not have the discretion to impose the Challenged Restrictions because he did not possess the power to do so under the Delaware Constitution.[150] As Appellee points out, this argument is circular and fails to confront the relevant question under the first prong of the STCA, which addresses the type of authority being wielded, not whether it was wielded properly.[151] Appellee contends that the Superior Court correctly held that the Governor's exercise of authority under the Emergency Management Act was discretionary.[152]

Appellants failed to carry their burden of showing that the Governor's conduct was ministerial rather than discretionary.[153] "Whether an act is discretionary or ministerial is a legal determination."[154] "Discretionary acts are those which require

[149] Superior Court Opinion at 492.

[150] Appellants' Opening Br. at 38–40.

[151] Appellee's Answering Br. at 16.

[152] *Id.* at 14.

[153] *Minner*, 2013 WL 871784, at *5–6.

[154] *Wonnum v. Way*, 2017 WL 3168968, at *3 (Del. Super. July 25, 2017); *Guitierrez v. Advanced Student Transp., Inc.*, 2015 WL 4460342, at *4 (Del. Super. July 14, 2015); *Hale v. Elizabeth W. Murphey Sch., Inc.*, 2014 WL 2119652, at *4 (Del. Super. May 20, 2014).

some determination or implementation which allows a choice of methods, or, differently stated, those where there is no hard and fast rule as to a course of conduct."[155] When the law prescribes only a general mandate for officials' actions, we have concluded that it provides for discretionary decision making.[156] In contrast, ministerial acts are performed in a prescribed manner without requiring an official to exercise judgment regarding what should be done.[157] Ministerial actions "involve less in the way of personal decision or judgment."[158]

This Court has previously held that "the Governor's exercise of emergency powers is a discretionary act."[159] The language of the Emergency Management Act is broad and provides that the Governor "*may* issue, amend and rescind all *necessary* executive orders, emergency orders, proclamations and regulations, which shall have the force and effect of law."[160] Additionally, the Emergency Management Act permits the Governor to "[t]ake such other actions as the Governor *reasonably believes necessary* to help maintain life, health, property, or public peace."[161] The Emergency Management Act does not identify any specific actions that the

---

[155] *Simms v. Christina Sch. Dist.*, 2004 WL 344015, at *8 (Del. Super. Jan. 30, 2004).

[156] Superior Court Opinion at 488 (citing *Minner*, 2013 WL 871784, at *5–6).

[157] *Simms*, 2004 WL 344015, at *8.

[158] *Sussex County v. Morris*, 610 A.2d 1354, 1359 (Del. 1992).

[159] *Facer*, 2022 WL 1561444, at *1.

[160] 20 *Del. C.* § 3115(b) (emphasis added).

[161] 20 *Del. C.* § 3116(b)(13) (emphasis added).

Governor must take or refrain from taking to "maintain life, health, property, or public peace" in response to the pandemic.[162] There are no "hard and fast rules" as to how the Governor is to respond to an emergency of this sort or any other.[163]

In enacting the Emergency Management Act, the legislature accorded the Governor broad authority to make policy decisions and choices that he believed were reasonable and necessary to address the emergency at hand. As the Superior Court explained:

> The Governor's authority under the Emergency Management Act is broad so that he may best apply his well-reasoned judgment and tailor the State's response to a novel crisis without having to be overly concerned that his actions might violate the law. The COVID-19 pandemic is precisely the type of unprecedented, unpredictable emergency the Delaware legislature likely contemplated when enacting this statute.[164]

Thus, we affirm the Superior Court's finding that the Governor's adoption of the Challenged Restrictions was an exercise of his discretionary authority, and he therefore is immune under the STCA from Appellants' damages claims arising under the Delaware Constitution.

---

[162] 20 *Del. C.* § 3116(b)(13).

[163] *Simms*, 2004 WL 344015, at *8 (finding immediate supervisor's conduct was discretionary because there were no "hard and fast" rules concerning the manner in which he was to supervise a residential advisor).

[164] Superior Court Opinion at 490.

## 2. Section 1983 and Qualified Immunity.

Appellants also contend that the Superior Court erred in holding that their claims arising under the United State Constitution and 42 U.S.C. § 1983 were barred by the doctrine of qualified immunity.[165] Section 1983 provides that:

> Every person who, under color of any statute . . . of any State . . . subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . .[166]

To succeed on a Section 1983 claim, a plaintiff must establish: (1) a deprivation of a right under the United States Constitution (2) by a person acting under color of State law.[167] In addition, a plaintiff must establish that the official's conduct is not protected by qualified immunity.[168]

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[169] The purpose of qualified immunity is to protect officials when

---

[165] Superior Court Opinion at 480.

[166] 42 U.S.C. § 1983.

[167] *Hunt ex rel. DeSombre v. State, Dep't of Safety & Homeland Sec., Div. of Del. State Police*, 69 A.3d 360, 365 (Del. 2013) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)); *West v. Atkins*, 487 U.S. 42, 49 (1988)).

[168] *Hunt ex rel. DeSombre*, 69 A.3d at 365 (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

[169] *Pearson*, 555 U.S. at 231.

their jobs require them to make difficult on-the-job decisions or when they make "reasonable mistakes about the legality of their actions . . ."[170] Qualified immunity applies whether the "government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."[171]

Under established precedent, qualified immunity bars a Section 1983 claim so long as the official's conduct did not violate a *clearly established* constitutional or statutory right.[172] "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[173] Qualified immunity broadly protects government officials, shielding "all but the plainly incompetent" and "those who knowingly violate the law."[174]

It is important to evaluate whether a right was "clearly established" when it allegedly was violated, without relying on information not available at that time and developments in the law that occurred later. Now, the emergency has passed, public

---

[170] *Mauro v. Cuomo*, 2023 WL 2403482, at *7 (E.D.N.Y. Mar. 8, 2023). *See Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012); *Zieper v. Metzinger*, 474 F.3d 60, 71 (2d Cir. 2007); *Hanson v. Del. State Pub. Integrity Comm'n*, 2012 WL 3860732, at *15 (Del. Super. Aug. 30, 2012), *aff'd*, 69 A.3d 370 (Del. 2013).

[171] *Pearson*, 555 U.S. at 231 (internal quotation marks omitted).

[172] *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (internal quotations omitted) (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). The trial court has broad discretion to decide the order in which they analyze the two inquiries of a qualified immunity analysis. *See Pearson*, 555 U.S. at 236 (holding that the more stringent two step inquiry for deciding government officials' qualified immunity claims outlined in *Saucier v. Katz*, 533 U.S. 194 (2001) was no longer mandatory).

[173] *Reichle v. Howards*, 566 U.S. 658, 658 (2012) (internal quotation marks and alteration omitted).

[174] *Malley v. Briggs*, 475 U.S. 335, 335 (1986).

opinions vary widely about decisions made in emergent conditions, and many courts have had the opportunity to consider "on a clear day" the constitutional parameters of emergency restrictions imposed on religious worship during the pandemic. But we must eschew the temptation to use the benefit of hindsight to evaluate whether the Governor's conduct violated "clearly established" rights.

Equally as important, our analysis cannot rest on generalities regarding the importance of Appellants' First Amendment rights. When defining "clearly established" rights, the United States Supreme Court has instructed courts that "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'"[175] The clearly established law must be "particularized to the facts of the case."[176]

The facts of this case arose during a period of uncertainty and at the beginning of an unprecedented public health crisis in which a previously unknown, deadly virus with no available treatment was spreading rapidly through the population and overwhelming health systems.[177] The mechanism for spreading the virus was initially unclear. The Challenged Restrictions were adopted in the first two-and-a-half months of the pandemic and changed continuously as the Governor and his

---

[175] *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

[176] *White*, 580 U.S. at 79 (internal quotations omitted) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[177] Chancery Opinion at 1211; Superior Court Opinion at 472–74.

41

administration attempted to respond to developing information and guidance from public health officials.

Appellants contend that because the Governor's "misconduct was illegal under multiple provisions of the Delaware Constitution, [the Governor] had fair warning of the law and the right was clearly established."[178] Appellants argue that the Third Circuit and U.S. Supreme Court "have 'consistently' and repeatedly held that when the challenged state actions already are illegal under state law, the state law violation makes the federal violation 'obvious' even in the absence of materially similar cases."[179] Appellants allege that the Governor's "*de facto* exemption of Jewish religious rites of circumcision and the Minyan from his Orders while targeting the Protestant religious rites of baptism and communion has long violated Free Exercise."[180] Further, Appellants argue that the Superior Court erred by requiring factually "identical cases addressing church closures and establishment issues occurring during a pandemic."[181] Appellants note that health crises, plagues, and pandemics are not new in our country's history and do not give the Governor the right to violate citizens' rights to freely exercise their religion.[182]

---

[178] Appellants' Opening Br. at 44–45.

[179] *Id.* at 44.

[180] *Id.* at 52.

[181] *Id.* at 48.

[182] *Id.* at 48–54.

Despite Appellants' argument that the Governor's actions were "obvious" violations of Appellants' First Amendment rights even in the absence of materially similar cases, courts around the country have held that it is "irrational" to claim that similar actions taken in response to a pandemic clearly violated Supreme Court precedent.[183] During this time "there was no clear consensus among federal or state courts that the Governor's actions were unlawful."[184] In its decision, the Superior Court conducted a thorough analysis of cases around the country and found that "the law was wholly unsettled as to whether officials could issue certain restrictions for the purpose of preventing the spread of the coronavirus that may have also curtailed individuals' First Amendment or Equal Protection rights."[185] In particular, the Superior Court pointed to U.S. District Court decisions in *Northland Baptist Church of St. Paul, Minnesota v. Walz*,[186] *Case v. Ivey*,[187] and *Mader v. Union Township*,[188]

---

[183] *See Hinkle Fam. Fun Ctr., LLC v. Grisham*, 586 F. Supp. 3d 1118, 1129 ("[I]t is simply irrational to assert that a reasonable health official would have known that imposing business closings in response to a pandemic clearly violated Supreme Court precedent.") (quoting *Bojicic v. DeWine*, 569 F. Supp. 3d 669, 692 (N.D. Ohio 2021)); *Bastian v. Lamont*, 2022 WL 2477863, at *7 (D. Conn. 2022) ("[I]t is implausible that 'every reasonable official' would have understood issuing or enforcing public health policies violated the plaintiffs' rights.").

[184] Superior Court Opinion at 482.

[185] *Id.*

[186] 530 F. Supp. 3d 790, 806–07 (D. Minn. 2021), *aff'd sub nom. Glow In One Mini Golf, LLC v. Walz*, 37 F.4th 1365 (8th Cir. 2022).

[187] 542 F. Supp. 3d 1245, 1269–80 (M.D. Ala. 2021), *aff'd*, 2022 WL 2441578 (11th Cir. July 5, 2022).

[188] 2021 WL 3852072, at *7 (W.D. Pa. Aug. 27, 2021).

all of which found that the defendants were entitled to qualified immunity from claimed violations of the plaintiffs' First Amendment rights because the plaintiffs could not demonstrate that the defendants violated a clearly established right.[189]

Appellants have not pointed to any binding precedent from the United States Supreme Court or the Third Circuit, or to a "robust consensus" in other courts addressing the particularized facts of this case. Instead, Appellants rely on cases generally addressing the scope of free exercise rights. But identifying generalized rules regarding the First Amendment and the free exercise of religion does not overcome qualified immunity because the purpose of the doctrine is to protect officials who make difficult decisions on the basis of developing facts. A plaintiff's burden under qualified immunity does not end when a constitutional violation is pinpointed; it rests on whether the official should have known that their actions violated a clearly established constitutional right. In hindsight, we can identify a possible constitutional violation arising from the Challenged Restrictions' non-neutral treatment of Houses of Worship or of particular types of worship, but we cannot find that it was clearly established *at the time the restrictions were in effect* that these temporary, emergency limitations intended to shield human life were unconstitutional. Consequently, Appellants have not carried their burden to lift the shield of qualified immunity.

---

[189] Superior Court Opinion at 482.

Case law that has developed since the Challenged Restrictions were lifted supports the view that the restrictions violated Appellants' rights. Well after the Challenged Restrictions were lifted, the United States Supreme Court issued its opinion in *Roman Catholic Diocese of Brooklyn v. Cuomo*, in which the Court held that a church and synagogue established that they would likely prevail in proving that occupancy limitations at public places of worship violated the Free Exercise Clause of the First Amendment.[190] A future governor confronted with a future public-health emergency would have the benefit of that precedent, but it was not available at the time Appellee made the decisions at issue. Although singling out Houses of Worship for heightened restrictions was a probable constitutional violation under *Cuomo*, we affirm the Superior Court's holding that at the time the Challenged Restrictions were adopted there was no "clearly established law" addressing these particularized facts.

## IV. CONCLUSION

For the foregoing reasons, we affirm the holdings of the Court of Chancery and the Superior Court.

---

[190] 592 U.S. 14 (2020).